[No. D007064. Fourth Dist., Div. One. Mar. 27, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
FELIX A. McELROY, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1] Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of sections III-A, III-B and IV-B.

**COUNSEL**

Howard J. Specter, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Janelle B. Davis and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—Defendant Felix A. McElroy was convicted of fifteen counts of robbery with personal use of a firearm (Pen. Code,[2] §§ 211, 12022.5), ten counts of robbery while armed with a firearm (§§ 211, 12022, subd. (a)), two counts of robbery (§ 211), one count of attempted robbery with personal use of a firearm (§§ 664/211, 12022.5) and one count of

---

[2] All statutory references are to the Penal Code unless otherwise specified.

attempted robbery while armed with a firearm. (§§ 664/211, 12022, subd. (a).) McElroy was sentenced to state prison for an aggregate term of 31 years and 8 months.[3]

I

SUMMARY OF CONTENTIONS ON APPEAL

McElroy raises numerous contentions on appeal, challenging several of the judgments of conviction (i.e., counts 7, 9, 15, 25 and 26), and further challenging the propriety of the sentence imposed by the trial court.

McElroy raises four different challenges to the judgments of conviction. First, he contends the evidence was insufficient to support the conviction on count 7 (robbery) because there was no evidence any property was taken from the victim. Second, McElroy claims there was insufficient evidence to support the convictions on counts 25 (robbery) and 26 (robbery), contending the eyewitness identification of him as the perpetrator of the robberies was too weak. His third contention is that the conviction on count 15 (attempted robbery) is void because the trial court, having previously granted his motion for acquittal on the original count 15 charge of robbery, thereafter lacked jurisdiction to permit the People to amend count 15 to charge attempted robbery. Fourth, McElroy contends his convictions on counts 9 (robbery) and 26 (robbery) must be reversed because the convictions were based solely upon the transcript of testimony given by the victims at the preliminary hearing. McElroy argues the transcript was improperly admitted at trial because the People failed to demonstrate due diligence in attempting to secure the attendance of the two witnesses for trial.

McElroy challenges the propriety of the sentencing on two grounds. First, he contends the imposition of consecutive enhancements for each of the section 12022.5 firearm use allegations found to be true was improper under the "single-occasion" rule. Second, McElroy contends the trial

---

[3] On count 1, designated as the principal term, the midterm of three years plus two years for firearm use enhancement was imposed. Consecutive terms of one year and eight months (one-third the midterm plus one-third of the two-year § 12022.5 enhancement) were imposed on counts 2, 6, 7, 12, 13, 14, 16, and 21 through 26. Consecutive terms of one year (one-third the midterm) were imposed on counts 8 through 11 and 19, without enhancement for the section 12022, subdivision (a) findings of the jury on counts 8 through 11. Concurrent terms of one year (one-third the midterm) were imposed on counts 20 and 28 through 33, without enhancement for the section 12022, subdivision (a) findings of the jury on counts 28 through 33. A concurrent term of one year and two months was imposed on count 15 (attempted robbery with § 12022.5 enhancement), and a concurrent term of six months was imposed on count 27 (attempted robbery) without enhancement for the section 12022, subdivision (a) findings of the jury on count 27.

court's reasons for imposing consecutive sentences were improper, requiring remand for resentencing.

Because we are persuaded by some, but not all, of McElroy's contentions, we affirm in part, reverse in part, modify in part, and remand this matter to the trial court for resentencing in accordance with this opinion. After reviewing the litany of crimes which gave rise to McElroy's convictions, we will address McElroy's contentions seriatim.

## II

### FACTUAL BACKGROUND

McElroy was convicted of participating in 11 different robberies over a 6-week period during which at least 27 different people were victimized by actual or attempted robberies, most of which involved the use or possession of a firearm.

On March 9, 1987 (count 6), McElroy and a partner committed robbery in a retail establishment by forcing the victim-employee, at gunpoint, to open two cash registers, from which money was removed. McElroy was convicted of robbery, with the jury finding he personally used a firearm in committing this crime.

On March 11, 1987 (counts 8 through 11), McElroy and a partner robbed victims in another retail establishment at gunpoint, taking money from the cash register of one victim-employee and robbing three victim-customers who were standing in line. McElroy was convicted of four counts of robbery, with the jury finding (on each count) he was armed with a firearm in committing these crimes.

On March 12, 1987 (count 16), McElroy and a partner robbed in another retail establishment, forcing the victim-employee at gunpoint to open the cash register, from which the cash was removed. McElroy was convicted of robbery, with the jury finding he personally used a firearm in committing this crime.

On March 18, 1987 (counts 12 through 15), McElroy and a partner returned to the site of the March 11 robbery, and again robbed personnel at the store. The first victim, an employee, was forced, at gunpoint, to open the cash register, from which the cash was removed. As the first victim was being robbed, a second victim (also an employee) began to approach the register, and was warned not to try anything. A few moments later, McElroy instructed his partner to "Go back and get his [the second victim's]

money." The partner then robbed the second victim of the cash in his wallet. A third victim (a customer), who had entered the store while the robbery was in progress, was also forced at gunpoint to turn over his money. A fourth victim-customer (count 15) was also in the store during the robbery. McElroy approached her, pointed his gun at her and demanded her money. The victim stated she had no cash, and gave McElroy her "A.T.M." card instead. McElroy returned her card, slapped her, and he and his partner then exited. McElroy was convicted of three counts of robbery (counts 12 through 14), with the jury finding (on each count) he personally used a firearm in committing the crimes. McElroy was also convicted of attempted robbery (count 15) with the jury finding he personally used a firearm in committing this crime.

On March 30, 1987 (count 7), McElroy and a partner returned to the site of the March 9 robbery. He confronted the victim, and forced him at gunpoint toward the register. McElroy was convicted of robbery, with the jury finding he personally used a firearm in committing this crime.

On April 6, 1987 (counts 19 and 20), McElroy and a partner committed robbery at another retail establishment. He forced one victim-employee, at gunpoint, into the cash register area where a second victim-employee was standing. The robbers forced the first victim to open the register, from which the money was removed. The robbers also took cash from the wallet of the second victim, and then fled. McElroy was convicted of two counts of robbery.

On April 7, 1987 (counts 21 through 24), McElroy and two partners perpetrated robberies at a grocery store. Three victim-employees were working at their respective checkstands when the robbers entered, announced the robbery, and ordered everyone to "get down." Each of the robbers displayed firearms, and took cash from each of the three cash registers. A fourth victim, a customer, was standing in line at one of the registers and was also robbed at gunpoint. McElroy was convicted of four counts of robbery with the jury finding (on each count) he personally used a firearm in committing these crimes.

On April 8, 1987 (counts 25 and 26), McElroy and a partner robbed victims at another retail establishment. Four employees were at work when the two robbers entered, pulled their pistols, and ordered everyone to the floor. The first victim-employee was forced by one robber, at gunpoint, to open two registers, from which the cash was removed. Meanwhile, the second robber was standing at the second victim-employee's register (count 26), threatening to kill her because she was unable to open the register. The first victim ran to assist in opening the register and was told by one of the

robbers "You want everybody in the store to die? You better pop it open." After this register was opened, the money was removed and the robbers fled. McElroy was convicted of two counts of robbery, with the jury finding (on each count) he personally used a firearm in committing these crimes.

On April 13, 1987 (counts 27 through 32), McElroy and two partners robbed victims at a coffee shop. The robbers, armed with guns, entered and surrounded the cash register, from which cash was removed. While one robber waited by the register, the other two robbers approached the counter where the customers were seated. One robber forced a victim-employee, at gunpoint, to open a second register, but found it was empty. The robber, joined by one of his confederates, then proceeded to rob four customers seated at the counter. McElroy was convicted of five counts of robbery and one count of attempted robbery, with the jury finding (on each count) he was armed with a firearm in committing these crimes.

McElroy's crime spree continued the following night. On April 14, 1987 (count 33), McElroy and a partner robbed at yet another retail establishment. The victim, an employee, was forced at gunpoint to open the cash register and turn over the cash. McElroy was convicted of one count of robbery, with the jury finding he was armed with a firearm in committing this crime.

The crime spree ended two days later. On April 16, 1987 (counts 1 and 2), McElroy and a partner committed their final robberies at a retail establishment. McElroy robbed one victim-employee at gunpoint, forcing her to open her cash register and hand over the cash, while his partner forced another victim-employee to open her register, from which he removed its contents. McElroy was convicted of two counts of robbery, with the jury finding (on each count) he personally used a firearm in committing these crimes.

### III-A, III-B*

. . . . . . . . . . . . . . . . . . . . . .

C. *The Judgment on Count 15 Must Be Reversed Because the Unqualified Grant of Defendant's Motion for Acquittal on the Charged Offense of Robbery Barred Subsequent Prosecution for the Uncharged Lesser Included Offense of Attempted Robbery*

At the conclusion of the People's case, McElroy moved for acquittal pursuant to section 1118.1 as to counts 15 (robbery) and 27 (robbery),

---

*See footnote 1, *ante,* page 1415.

arguing the evidence failed to show any property was taken from either victim. The People conceded no property had been taken from the victim in count 27, and therefore moved to amend count 27 to plead attempted robbery, which motion was granted. On count 15, however, the People argued property (albeit of minimal value) had been briefly taken from the victim which justified a conviction for robbery. The trial court disagreed with the People's argument, and therefore granted McElroy's motion *without qualification,* ordering count 15 deleted from the information.

The People thereafter moved to amend count 15 to plead attempted robbery. The court, over McElroy's objection, granted the motion to amend. ■■■ On appeal, McElroy contends the court, having orally rendered a judgment of acquittal, was without jurisdiction to modify or reconsider any portion of the pronounced judgment. McElroy relies principally upon *People* v. *Garcia* (1985) 166 Cal.App.3d 1056 [212 Cal.Rptr. 822].

*Garcia* cannot be distinguished from the instant case, and we are persuaded by the reasoning in *Garcia* that the trial court here was without power to modify its previously ordered judgment of acquittal through permitting an amendment to the information. In *Garcia,* as here, the information charged defendant with the greater offense (i.e., forcible rape) but was silent on any lesser included offenses as to that victim. In *Garcia,* as here, the trial court orally granted defendant's motion for acquittal on the charged offense without qualification. In *Garcia,* as here, before any further trial proceedings transpired, the People sought "clarification" on whether the acquittal precluded further prosecution for the lesser included offense of attempted rape. In *Garcia,* as here, the trial court concluded the judgment of acquittal on the charged offense did not include acquittal of the uncharged lesser included offenses.[5] Finally, in *Garcia,* as here, defendant was convicted of the lesser included offense.

The *Garcia* court reversed the conviction for the lesser included offense of attempted rape, holding the unqualified grant of the motion for acquittal on

---

[5] The People purport to distinguish *Garcia* on the theory that the defendant in *Garcia* was convicted of an offense which was never specifically charged in the information, whereas here, the lesser included offense was specifically pled by the amendment following the grant of McElroy's motion for acquittal. Nothing in *Garcia* suggests the result would have changed if the People had requested leave to amend rather than "clarification." To the contrary, *Garcia* suggests that once the motion for acquittal is granted, the court is without jurisdiction to reconsider, change, modify or correct its ruling. Since a judgment of acquittal normally includes acquittal on all necessarily included lesser offenses (in the absence of either separately pled counts, or specific jury instructions which charge the jury with the duty to consider defendant's guilt on those lesser offenses), any amendment to the information to resurrect a lesser included offense would appear to constitute a "change, modification or correction" to the previously entered judgment, which *Garcia* concluded was improper.

the charged offense encompassed acquittal on any lesser included offense. (*People* v. *Garcia, supra,* 166 Cal.App.3d at p. 1069.) We likewise conclude that, in the limited circumstances before us (i.e., where the accusatory pleading fails separately to charge lesser included offenses, and the court grants a motion for acquittal under section 1118.1 without any prior indication that the ruling is intended to be limited to acquittal only on the greater, charged offense), the judgment of acquittal on the charged offense includes acquittal on all uncharged lesser included offenses.

■ Our conclusion, and the reasoning in *Garcia,* finds support in the logical premise that a judgment of acquittal, whether entered by jury verdict or by grant of a section 1118.1 motion, should be accorded equal weight and consequences. A jury's verdict of acquittal on the charged offense protects a defendant from further liability for any lesser offenses necessarily included in the charged offense (§ 1023; *People* v. *McDonald* (1984) 37 Cal.3d 351, 377-378 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011] [acquittal of robbery by jury bars prosecution for attempted robbery]) *unless* that verdict is accompanied by an indication that the judgment of acquittal did not encompass acquittal of the uncharged lesser included offenses. (*Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809].) Where a jury verdict both acquits the defendant of the greater offense, and remains silent with respect to uncharged lesser included offenses, the defendant is protected from further liability. (*People* v. *McDonald, supra,* at p. 378.)

■ Our holding here accords similar consequences to a trial court's judgment of acquittal: When a trial court grants a defendant's motion under section 1118.1, and remains silent as to whether the acquittal is limited to the charged greater offense, the trial court should not thereafter be permitted to alter or modify its apparently unqualified acquittal by permitting the People (through amendment of the accusatory pleading) to charge necessarily included lesser offenses.

■ Our decision, of course, does not prohibit the trial court from appropriately limiting the impact of the grant of a section 1118.1 motion. As stated in *People* v. *Garcia, supra,* 166 Cal.App.3d 1056, trial courts may properly limit their rulings (by, for example, entertaining motions to amend the accusatory pleading specifically to charge the lesser included offense before ruling on the section 1118.1 motion). ■ Our holding is that the trial court may not unqualifiedly acquit a defendant of the charged offense on the merits, and subsequently modify its ruling to reinstate liability for the same conduct through permitting an amendment to charge a lesser included offense.

For the foregoing reasons, McElroy's conviction on count 15 is reversed.

D. *The Trial Court Did Not Abuse Its Discretion in Concluding the Prosecution Had Exercised "Due Diligence" in Attempting to Locate and Secure the Attendance of Witnesses Potvin and Veanoni, and Properly Permitted Their Preliminary Hearing Testimony to be Introduced at Trial*

McElroy finally challenges the convictions on counts 9 and 26. He argues the trial court erroneously permitted the People to utilize the transcripts of the preliminary hearing testimony of two witnesses (Steve Potvin, the victim in count 9; and Heather Veanoni, the victim in count 26) who had become unavailable before trial subpoenas were served. The parties sharply differ on both the appropriate standard for our review of the trial court's determination of "due diligence," and on whether the prosecution met its burden of showing it exercised due diligence.[6]

### 1. *Standard of Review*

■ McElroy contends the issue of whether due diligence was shown is subject to "independent review" by the appellate court, relying on *People* v. *Louis* (1986) 42 Cal.3d 969 [232 Cal.Rptr. 110, 728 P.2d 180]. The People, on the other hand, contend *Louis* did not alter the traditional standard of review, and argue our review remains circumscribed by the traditional standard of "abuse of discretion."

We conclude, based on subsequent pronouncements of the California Supreme Court and a careful review of *Louis,* the traditional standard of review (i.e., "abuse of discretion") remains the governing standard of review.

In *Louis,* our Supreme Court considered whether to abandon the governing standard of "abuse of discretion," confirmed in *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], and to substitute the broader standard of "independent review." The court indicated the issue of "due diligence" was a mixed question of law and fact, and surmised the proper standard may be "independent review." (*People* v. *Louis, supra,* 42 Cal.3d at p. 984.) Although indicating independent review might be appropriate, the court declined the opportunity to impose this new standard of

---

[6] In light of our determination that the trial court did not err in admitting the transcripts of the witnesses' testimony, it is unnecessary to decide whether the People can show, beyond a reasonable doubt, the testimony of these witnesses did not contribute to the guilty verdicts. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

review, stating that ". . . we need not resolve the issue; under any standard, the admission . . . was error. . . ." (*Id.* at p. 989.)

While the *Louis* dicta ordinarily would be accorded substantial weight by this court (*Smith* v. *Mt. Diablo Unified Sch. Dist.* (1976) 56 Cal.App.3d 412, 418 [128 Cal.Rptr. 572]), the subsequent Supreme Court decision in *People* v. *Hovey* (1988) 44 Cal.3d 543 [244 Cal.Rptr. 121, 749 P.2d 776] compels us to conclude the Supreme Court continues to adhere to the traditional "abuse of discretion" standard. The *Hovey* court, discussing the applicable standard, stated: "We have *held* that the question of due diligence is a factual one depending on the circumstances in each case, and that the trial court's determination of the issue will not be disturbed in the absence of a showing of an abuse of discretion [citations]. In *People* v. *Louis* (1986) 42 Cal.3d 969, 984-989 [citations] *we suggested (but did not decide)* that an appellate court should independently review the . . . due diligence issue." (*People* v. *Hovey, supra,* at p. 563, italics added.) The *Hovey* court apparently applied the "abuse of discretion" standard when it sustained the trial court's finding of due diligence, concluding the ". . . finding [was] supported by substantial evidence." (*Id.* at p. 562.)

Thus, the most recent Supreme Court guidance on this issue both reaffirmed the vitality of prior cases applying the "abuse of discretion" standard, and cautioned that any contrary analysis or suggestions in *People* v. *Louis, supra,* 42 Cal.3d 969 were dicta. ■ ■■■ We adhere to the Supreme Court's guidance, and therefore apply the abuse of discretion standard to this case.[7]

---

[7]Should we be deemed free to endorse either standard, we would on policy grounds select "abuse of discretion" as the appropriate standard for reviewing a determination of due diligence. Courts have consistently acknowledged due diligence to be a factual matter, "depending on the circumstances in each case." (*People* v. *Hovey, supra,* 44 Cal.3d at p. 563.) A determination of the reasonableness of efforts to procure attendance of a witness at trial cannot be assessed by reference to rigid rules of law; it depends upon analysis of practical human experience and contemporary community standards. For instance, an element to be evaluated is whether the search for the witness was "timely begun." (*People* v. *Linder* (1971) 5 Cal.3d 342, 347 [96 Cal.Rptr. 26, 486 P.2d 1226].) The trial court, unlike the appellate court, is conversant with the general congestion of its docket, and with the obstacles which might delay the trial of a particular criminal case. Such "delay" factors could influence the trial court's decision as to whether the subpoena process for a particular case was "timely commenced." However, the cold record which the appellate court would rely upon to conduct an independent review of "due diligence" would rarely reflect such "delay" factors and, hence, any appellate evaluation of "timely commencement" would incorporate a propensity to disregard these practical realities. Additionally, trial courts have experience with local subpoena practice and procedure: what efforts are customary; are those customary procedures generally successful in securing witnesses' attendance; and were there exigencies in a particular case which required more, or which justified less, stringent efforts than normally employed? This familiarity with accepted local procedures will influence a trial court's determination of whether efforts undertaken in a particular case were "reasonable under the circumstances."

## 2. The Trial Court Did Not Abuse Its Discretion in Finding "Due Diligence"

Before admitting the preliminary hearing testimony of the two missing witnesses, the trial court conducted an extensive evidentiary hearing to determine whether the People could demonstrate the foundational elements necessary to admissibility of the prior testimony. The trial court found the People had satisfied their burden and, accordingly, permitted the transcripts to be introduced at trial.

■ McElroy contends the trial court erred in finding "due diligence" had been exercised.[8] We disagree. The record amply supports the trial court's determination that due diligence was exercised. The subpoenas were issued 24 days in advance of trial; even shorter periods have been found reasonable. (*People* v. *Clayton* (1967) 248 Cal.App.2d 345 [56 Cal.Rptr. 413] [18 days].) After customary efforts to serve the witnesses were undertaken, without success, investigators undertook significant efforts to locate the missing witnesses. The investigators visited the witnesses' last known addresses; contacted roommates, parents and family members seeking current addresses, and left messages in case the witness contacted these individuals; contacted former employers; reviewed county and state-wide police records; checked motor vehicle department records; checked traffic court records; and checked post office records.

Similar efforts have been held sufficient to support a trial court's finding of due diligence. (See *People* v. *Ventura* (1985) 174 Cal.App.3d 784, 792

The appellate court, which lacks access to or experience with such practical data, is ill-equipped to account for these factors when independently evaluating whether efforts in a particular case were reasonable.

The deferential "abuse of discretion" standard properly assigns the trial court, with its reservoir of practical knowledge, the responsibility to evaluate the efforts in light of the circumstances and realities confronting prosecutors and law enforcement agencies.

[8] McElroy does not argue the efforts to locate the witnesses were insufficient. Instead, McElroy contends the People should have issued and served the trial subpoenas shortly after the original trial date (i.e., July 28, 1988) was set, rather than awaiting the outcome of the People's motion to consolidate this matter with a related case, which motion resulted in a continuance of the trial date to August 18, 1987. In the absence of this delay, McElroy speculates, the witnesses would have been located and served before they disappeared. However, McElroy does not suggest the People had reason to believe these witnesses would disappear during this hiatus, nor does the record contain any hint of "bad faith." Instead, McElroy seems simply to argue the People's failure to predict that witnesses would become unavailable during the seven-week hiatus should, by itself, compel a finding of lack of due diligence. Similar arguments were presented in *People* v. *Hovey, supra,* 44 Cal.3d at p. 564 (i.e., defendant argued the witness should have been subpoenaed before he disappeared, or alternatively, periodic "tabs" should be kept on material witnesses in criminal cases), and were rejected. McElroy cites no authority which automatically equates the failure to foresee the disappearance of witnesses with a failure of due diligence, and we are unwilling to impose such prescience as a prerequisite to due diligence.

[220 Cal.Rptr. 269].) We will not reverse a trial court's determination simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution. Where the record reveals, as here, that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." (See, e.g., *People* v. *Smith* (1980) 112 Cal.App.3d 37, 46 [169 Cal.Rptr. 108]; *People* v. *Salas* (1976) 58 Cal.App.3d 460, 471 [129 Cal.Rptr. 871].) The law requires only reasonable efforts, not prescient perfection. We conclude the trial court did not abuse its discretion in finding due diligence.

IV

APPELLANT'S CHALLENGES TO SENTENCING

*A. The Trial Court Erred in Imposing Sentence Enhancements for Each of the Penal Code Section 12022.5 Allegations Found to Be True*

The trial court imposed consecutive term enhancements for 14 of the 15 counts on which the jury made "true" findings on the "use of firearm" allegations[9] under section 12022.5.[10] ▮ McElroy contends the court was only permitted to impose seven enhancements under the doctrine enunciated in *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23]. The People argue that *Culbreth* should be interpreted to allow multiple enhancements whenever McElroy's course of conduct would permit multiple convictions notwithstanding section 654. Alternatively, they assert, a "proper" *Culbreth* analysis would permit at least nine enhancements.

We conclude the *Culbreth* constraints permit only seven enhancements as to those counts on which consecutive term enhancements were imposed.

---

[9] The jury found that McElroy "personally [used] a firearm . . . within the meaning of Penal Code section 12022.5" in the commission of the offenses charged in counts 1, 2, 6, 7, 12 through 16, and 21 through 26. The court imposed a two-year consecutive term enhancement as to count 1, and eight-month consecutive term enhancements on each of the remaining counts except for count 15, on which the enhancement was imposed concurrently.

The jury also made true findings on the allegations that McElroy was armed with a firearm (§ 12022, subd. (a)) in committing the offenses charged in counts 8 through 11, and 27 through 33, but the court did not impose any sentence enhancements on those findings.

[10] Section 12022.5 provides, in pertinent part: "Any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he . . . has been convicted, be punished by an additional term of imprisonment in the state prison for two years . . . ."

■ In *Culbreth,* our Supreme Court established the so-called "single-occasion" rule. The single-occasion rule prohibits the imposition of multiple sentencing enhancements for firearm use where the defendant is convicted of multiple offenses, each while using a firearm, when all of the offenses occur during a single, indivisible transaction. "[I]f all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, then section 12022.5 may be invoked only once and not in accordance with the number of victims." (*In re Culbreth, supra,* 17 Cal.3d at p. 333.)[11]

The *Culbreth* rule has been applied, sometimes reluctantly (see *People* v. *Raby* (1986) 179 Cal.App.3d 577 [224 Cal.Rptr. 576]), to robbery incidents which are substantively indistinguishable from the present case. For example, in *People* v. *Polk* (1982) 131 Cal.App.3d 764 [182 Cal.Rptr. 847], the defendant robbed numerous patrons during a single holdup of a restaurant and was charged and convicted of numerous robbery counts, each with true findings regarding the firearm use allegations. The appellate court held, under *Culbreth,* the trial court erred in imposing enhancements on each of the robbery convictions, and remanded the matter for sentencing with directions that only one firearm enhancement could be imposed because all of the convictions arose from a single, indivisible transaction. (*Id.* at p. 778.) Similarly, in *People* v. *Edwards* (1981) 117 Cal.App.3d 436 [172 Cal.Rptr. 652] defendant was convicted on two counts of robbery arising from one incident (robbery at a retail store with two victim-employees) and three other counts of robbery arising from a second incident (three victims in an apartment). The appellate court held, under *Culbreth,* the trial court was only permitted to impose one section 12022.5 enhancement for each occasion. (*People* v. *Edwards, supra,* at pp. 447-449.)

---

[11] According to *Culbreth,* the legislative purpose of section 12022.5 is to deter firearm uses on *subsequent* occasions. To implement this perceived policy, *Culbreth* adopted the "single-occasion" rule, which permits only one deterrent "firearm use" sentence to be imposed "per occasion," regardless of the number of offenses committed or persons victimized during that occasion. However, *Culbreth* and its progeny recognized the deterrent effect of section 12022.5 may be operable, and hence multiple sentence enhancements permissible, under either one of two circumstances. First, when there is a meaningful separation of time between the originally contemplated crime and a subsequent crime, the defendant then has time to pause and reflect on the penal consequences (i.e., another § 12022.5 sentence) of his subsequent use of a firearm, and the deterrent purpose would therefore be served by permitting additional enhancements. Second, when an "independent criminal objective" emerges, which is unrelated to the defendant's original criminal objective for which he used the firearm, the defendant can again reflect on the enhanced penal consequences of using the firearm in pursuing this new objective, and the deterrent purposes would again be served by permitting multiple enhancements. (See generally, *People* v. *Levitt* (1984) 156 Cal.App.3d 500, 510-513 [203 Cal.Rptr. 276] [discussing genesis and parameters of *Culbreth* "single-occasion" rule].) In the absence of either a temporal hiatus or an independent objective, however, *Culbreth* declared no additional deterrent effect would be achieved by multiplying enhancements based on the fortuity of the number of victims or offenses which a single occasion might entail. (*In re Culbreth, supra,* 17 Cal.3d at p. 334.)

Here, the evidence indicates McElroy entertained a single intent and objective during each robbery: to take valuables from each store, and every person therein, insofar as time and circumstances would allow. There were no newly arisen objectives, nor did any significant time elapse between the robberies of each victim within the targeted locale. The People argue, however, that at least two of the robberies (i.e., the April 16 robbery, counts 1 and 2; and the March 18 robbery, counts 12 through 15) would permit multiple enhancements. The People's argument for both occasions is identical: While McElroy was victimizing one employee by looting the cash register, a theretofore uninvolved employee approached and immediately became yet another victim. The People argue these employees were unexpected victims which gave McElroy a newly arisen objective, justifying additional enhancements. However, there was no temporal hiatus during which McElroy could pause to reflect on the penal consequences of his successive use of the firearm (*People* v. *Levitt, supra,* 156 Cal.App.3d at p. 512), nor can we conclude an employee of the store which McElroy intended to rob is an unexpected victim unrelated to the primary criminal enterprise. (*People* v. *Raby, supra,* 179 Cal.App.3d at pp. 587-588.) Accordingly, we conclude the seven robberies on which consecutive enhancements were imposed, while involving multiple victims, were indivisible transactions involving a single intention and objective. Under *Culbreth,* only seven enhancements may be imposed for those events. (*In re Culbreth, supra,* 17 Cal.3d at p. 333.)

The People urge "reexamination" of *Culbreth.* The People argue the same rationale which permits the imposition of multiple consecutive sentences for offenses committed during a single event, despite section 654, should also be applied to permit multiple enhancements. Under section 654, an "act or omission" which violates numerous laws may only result in one punishment. However, the courts have construed section 654 to permit multiple punishments for an otherwise indivisible "act" (such as robbery in a jewelry store) when, during the course of the event, the defendant commits crimes of violence against multiple victims. (*People* v. *Miller* (1977) 18 Cal.3d 873 [135 Cal.Rptr. 654, 558 P.2d 552].) The People argue we may apply the same rationale, which permits punishment for each person victimized during the event, to permit an enhancement for each such victim, without doing violence to Supreme Court's mandate in *Culbreth.*

This argument overlooks the fact that the *Culbreth* court itself apparently considered and rejected this identical contention. *Culbreth,* citing with approval *People* v. *Johnson* (1974) 38 Cal.App.3d 1 [112 Cal.Rptr. 834], adopted the *Johnson* rationale in fashioning the "single-occasion" rule: ". . . [*Johnson*] discussed the issue with clarity: 'Usually section 654's prohibition against multiple sentences based upon a single criminal transaction

will prevent judgments containing more than a single finding under section 12022.5. Multiple sentences were proper here [i.e., despite § 654] only because there were multiple victims. [*However,*] [*t*]*his multiplicity of sentences did not engender multiplicity of weapon use.* Each defendant indulged in a single "use" in the course of the liquor store holdup, thus evoking section 12022.5 but once.'" (*Culbreth, supra,* 17 Cal.3d at p. 334, italics added.)

We are, therefore, rather clearly bound by Supreme Court precedent.[12]

Accordingly, we hold the trial court may impose only one enhancement for each of McElroy's robberies, calculating robberies by *transaction* rather than *number* of victims.[13]

### B.*

. . . . . . . . . . . . . . . . . . . . . . .

## V

### DISPOSITION

The judgment of conviction on count 15 is reversed. The judgment of conviction on count 7 is modified to reflect a conviction of attempted robbery in the second degree (§§ 664/211, 212.5, subd. (b)), and as so modified, is affirmed. In all other respects, the judgments of conviction are affirmed.

The matter is remanded to the trial court for resentencing. ■ Because the trial court is entitled, on remand, to reconsider its entire sentencing scheme and choices (*People* v. *Savala* (1983) 147 Cal.App.3d 63 [195 Cal.Rptr. 193]), and may elect to impose an aggregate sentence up to the aggregate term originally imposed (*People* v. *Hood* (1969) 1 Cal.3d 444, 459 [82 Cal.Rptr. 618, 462 P.2d 370]), we provide the following guidance for the trial court's consideration:

---

[12] Indeed, the rejection by the *Culbreth* majority of "parallel" treatment of multiple sentences (under § 654) and multiple enhancements (under § 12022.5), in cases involving multiple victims, was the precise cause for, and subject of, the dissenter's opinion. (*Culbreth, supra,* 17 Cal.3d at pp. 335-336.)

[13] In light of our disposition, we believe it is appropriate to remand this matter to the trial court for resentencing. Our conclusion that *Culbreth* restricts the permissible enhancements should not be construed, however, to preclude the trial court from considering the propriety of imposing enhancements for the section 12022, subdivision (a) findings. Under *Culbreth,* it appears counts 8 through 11 comprise a single occasion (i.e., the March 11 robbery), counts 27 through 32 an additional single occasion (i.e., the April 13 robbery), and count 33 yet another single occasion (i.e., the April 14 robbery).

*See footnote 1, *ante,* page 1415.

First, only one firearm enhancement may be imposed per occasion. The record reflects seven "use of a firearm" (§ 12022.5) occasions, and three "armed with a firearm" (§ 12022, subd. (a)) occasions, each of which may justify a consecutive term enhancement.

Second, the trial court properly considered California Rules of Court, rule 425(a)(1), (2), (3) and (5) to be applicable in considering imposition of consecutive sentences. On remand, the trial court's reasons for its sentencing choices should be explicitly restated during resentencing proceedings (*People* v. *Thornton* (1985) 167 Cal.App.3d 72 [212 Cal.Rptr. 916]) to ensure the trial court's choices are adequately supported by the record.

Kremer, P. J., and Work, J., concurred.