[No. B174888. Second Dist., Div. Eight. July 20, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JAIME AVILA, Defendant and Appellant.

---

COUNSEL

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson, Joseph P. Lee, Chung L. Mar and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

**RUBIN, Acting P. J.**—Jaime Avila appeals from the judgment following his convictions of assaulting two police officers with a semiautomatic firearm and of being a felon in possession of a gun. Because the court improperly permitted the People to use former trial testimony of a witness, we reverse and remand for retrial.

## FACTS AND PROCEDURAL HISTORY

Around 8:30 p.m. on February 1, 2003, Los Angeles Police Officers Brett Clark and Ben Perez were working a gang detail when they stopped near the intersection of Figueroa and 118th Street to talk to three suspected gang members. As they got out of their car, Officer Perez saw three Hispanic adults walking on the sidewalk toward the officers. One of the three, appellant Jaime Avila, started to run toward the officers. Officer Perez asked Officer Clark, "What's up with this guy?" Officer Clark looked up and saw appellant clutching his waistband and running toward them before dashing out to the street past their patrol car. The officers ordered appellant to come back, but when he continued running, they chased after him. As appellant reached the corner at 118th Street, he began to turn left. According to the officers, appellant "bladed" as he turned, raising his left arm and pointing a gun at them. Both officers drew their weapons and fired, but did not see or hear appellant drop his gun. They continued to chase appellant, but lost sight of him down an alley.

In the meantime, Officer Shawn Murphy and his partner were on the freeway when they received a radio call that officers needed help. Driving toward the area of the shooting, Officer Murphy saw someone tumble over the freeway embankment. The officers pulled over and found appellant lying facedown on the embankment, bleeding. Officer Murphy ordered appellant to put his hands out to his side; in Officer Murphy's words, appellant did "the best he could to comply." While appellant lay on the embankment mutely clenching and unclenching his fists, Officer Murphy called for an ambulance.

While Officer Murphy and his partner waited for the ambulance, Officer Scott Stevens arrived at the embankment. He knelt beside appellant and asked where his gun was. Scott testified appellant answered in a "regular speaking voice" and said, "Before I tell you I'd rather fucking die." The paramedics arrived at 8:45 p.m., about 10 or 15 minutes after Officer Murphy's call. Appellant's lung had collapsed and he was in shock. He verged on unconsciousness and could not speak, although he could make some incomprehensible sounds. During their journey to the hospital, a paramedic inserted a needle in appellant's chest, which reinflated his lung and pulled him back from unconsciousness, restoring his ability to talk. At the hospital, doctors treated him for a gunshot wound to the chest.

Because the evening's events included an officer-involved shooting, Los Angeles Police Detective Olivia Joya was called to the scene at Figueroa and 118th Street. When she arrived approximately two hours after the shooting,

there was "a lot of police activity" in the area. K-9 officers had retraced appellant's path but had failed to find a gun. While talking to her supervisor near the command post on Figueroa "a little north of 118th," Detective Joya looked down at the intersection. She saw something in the middle of 118th Street near the limit line, about 10 to 20 feet from an officer who was standing guard over bullet casings. Stepping toward the object, she saw it was a gun. The gun was checked for fingerprints, but none were found.

The People charged appellant with two counts of assault of a police officer with a semiautomatic firearm (Pen. Code, § 245, subd. (d)(2))[1] and one count of being a felon in possession of a gun (§ 12021, subd. (a)(1)). He pleaded not guilty and was tried by jury in December 2003. An acquaintance of appellant, Lori Gonzalez, testified for the People. She said appellant had spent the day of the shooting at her apartment, during which he had asked other guests in the apartment where he could get a gun. She also testified appellant telephoned her from jail after his arrest. During the call, she told him the police had found a gun. He initially replied he did not know what she was talking about, but then said "fuck." (We will discuss Gonzalez's testimony in greater detail below.)

During its deliberations, the jury requested readbacks of the testimony of several witnesses, including Gonzalez's testimony about appellant's jailhouse phone call. The jury could not reach a verdict and declared itself deadlocked. The court declared a mistrial and ordered a retrial.

Appellant was retried three months later in March 2004. The People waited until the morning the retrial started to try to serve Gonzalez with a subpoena to testify. Unknown to the People, however, she had apparently moved shortly after the first trial ended in December. For the next two days, the People attempted to find her but could not. (We discuss these efforts in more detail below.) On the third day, the People asked the court to declare Gonzalez an unavailable witness in order to permit the prosecutor to use her testimony from the first trial. Over appellant's objection, the court found the People had used due diligence in trying to find Gonzalez. The court therefore permitted the prosecutor to read to the jury Gonzalez's testimony from the first trial. The jury thereafter convicted appellant of two counts of assaulting the officers with a semiautomatic firearm and of being a felon in possession of a firearm. It found not true, however, that he personally and intentionally

---

[1] All undesignated section references are to the Penal Code.

used during the assaults a firearm, within the meaning of sections 12022.53, subdivision (b), and 12022.5, subdivision (a). The court sentenced appellant to 27 years eight months in state prison. This appeal followed.

## DISCUSSION

In appellant's first trial ending in the December 2003 mistrial, Lori Gonzalez testified she lived in an apartment on Figueroa, south of 119th Street. She testified appellant spent the day he was shot at her apartment with about half a dozen other males. While there, he asked where he could get a gun, which he needed because someone owed him money. She did not see anyone give him a gun.

Gonzalez further testified appellant telephoned her from jail after he was arrested. She told him she had seen the police find a gun. At first, he said he did not know what she was talking about, then said "fuck." He asked whether she would testify he left her apartment without a gun so that he could sue the police for shooting him. She did not answer him directly, but instead asked why he had run from the police. He replied he did not know the officers were police because their patrol car did not have a light bar and they had shaved heads, making him think they were gang members. He never answered her question why he pointed a gun at the officers.

Following the mistrial, both sides announced on March 8, 2004, they were ready to begin appellant's retrial. That morning, Detective John Garcia tried for the first time to contact Gonzalez for her retestimony. He went to her apartment and knocked on the door. When no one answered, he wedged his business card into the door jamb and left. Around noon, he called her apartment. Recognizing her voice on the answering machine, he left a message. Later that afternoon, he called again and left a second message.

The following morning, he telephoned her apartment around 7:00 or 7:30 a.m. and left another message on her answering machine. Needing her to testify the next day, he went to her apartment at 4:30 that afternoon. The front door was open and children were playing in the living room. He asked them if Gonzalez was home, and they said no. The mother of Gonzalez's live-in boyfriend lived next door. She came out of her apartment and told Garcia she had not seen Gonzalez since her last court appearance in December.

The next day, March 10, the prosecutor told the court she could not locate Gonzalez. The prosecutor asked the court to declare Gonzalez an unavailable

witness so she could use her testimony from the first trial. (Evid. Code, § 240, subd. (a)(5).) The court conducted a due diligence hearing that afternoon.

The prosecutor called Antonia Huertas, Gonzalez's next door neighbor and the mother of her boyfriend. Huertas testified Gonzalez and her son, Dario, fought over Gonzalez's testifying in the first trial. She said Gonzalez had moved out of the apartment after the first trial, and she had not seen her since.

The prosecutor then called Detective Garcia. He described his efforts the previous two days to find Gonzalez, which we have already recited. He also explained he had checked utility records and various electronic databases, including the Department of Motor Vehicles, which continued to list the apartment as her address. Finally, he told the court that earlier that afternoon he had spoken to a deputy sheriff "who [Gonzalez] has worked with in the past on unrelated type cases." The deputy told Garcia he had spoken to Gonzalez one month earlier and to his knowledge she still lived in the apartment. Detective Garcia also spoke with a homicide detective who "had worked with [Gonzalez] on a different case, and through that case he developed somewhat of a close relationship, business relationship where he would contact—they would contact each other on a regular basis." This detective had no idea of Gonzalez's whereabouts.[2]

The court found Gonzalez was unavailable[3] to testify. It further found the People had used due diligence trying to find her. The court therefore permitted the prosecutor to use her testimony from the first trial. Appellant contends the court erred because waiting until the first day of trial to find and subpoena Gonzalez was not due diligence.

---

[2] Gonzalez's dealings with the deputy sheriff and homicide detective were news to the defense. Appellant contends the People violated *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], by not disclosing those dealings during pretrial discovery. Because we reverse on other grounds, we need not reach the *Brady* issue or other issues appellant raises on appeal, as they are all moot.

[3] The court apparently concluded Gonzalez had moved from the apartment, leaving the police no way to find her. We note, however, that it is a very close question whether substantial evidence supported that conclusion. The best evidence Gonzalez had moved was Huertas's testimony that she had not seen Gonzalez in three months. Much evidence suggested, however, that Gonzalez still lived in the apartment. For example, utility and Department of Motor Vehicles records did not show a new address for her. Also, Gonzalez's voice was on the outgoing message of the apartment's answering machine. In addition, children playing in the apartment did not tell Detective Garcia that Gonzalez had moved, only that she was not there. And finally, one wonders what harm existed in Detective Garcia asking Gonzalez's boyfriend, Dario, about her whereabouts if the detective wanted to find her; at worst, Dario would have refused to say.

We independently review the People's efforts to serve Gonzalez. (*People v. Smith* (2003) 30 Cal.4th 581, 610 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243] (*Cromer*).) Due diligence suggests "untiring effort." (*People v. Salas* (1976) 58 Cal.App.3d 460, 470 [129 Cal.Rptr. 871]; see also *People v. Sanders* (1995) 11 Cal.4th 475, 523 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Waiting until the morning a trial begins to try to locate a witness after being out of touch for several months is generally not prudent or reasonable, and certainly is not an untiring effort to secure a witness's presence at trial. (See *Brown v. Superior Court* (1987) 189 Cal.App.3d 260, 265 [234 Cal.Rptr. 416] (*Brown*) [prosecutor's waiting to day of trial to subpoena police witness not due diligence].) Witnesses have jobs, they plan vacations (see *id.* at p. 262), they have child care responsibilities, they leave town for a few days. A party who wanted to ensure a witness was available to testify would usually plan ahead, and not wait a day or two before the testimony was needed.

Detective Garcia testified he waited until the morning the trial started because he feared Gonzalez would flee if he served her with a subpoena before then. He explained that his 22 years of experience taught him that witnesses in gang-related cases fear testifying and find ways to avoid appearing in court if they have time to ponder its implications. In support of Detective Garcia's reasonableness in waiting, respondent cites *People v. Diaz* (2002) 95 Cal.App.4th 695 [115 Cal.Rptr.2d 799] (*Diaz*), which found delaying until the first day of trial to serve a witness was reasonable. *Diaz* is distinguishable, however, because there the witness's fear at testifying made her uncooperative. (*Id.* at p. 707.)[4] Here, Gonzalez was cooperative and seemingly fearless. After her first day of testimony in the first trial, Gonzalez told Detective Garcia that her boyfriend, Dario, had beaten her for testifying against appellant. Despite the beating, she appeared the next day to finish testifying, and Detective Garcia asked her to tell him if Dario hit her again. When Detective Garcia did not hear from her, he assumed the beating had not reoccurred. Detective Garcia's belief of no more violence was the reason he expressed surprise that Gonzalez had moved when he tried to find her for appellant's retrial.

Detective Garcia and respondent are trying to have it both ways. At virtually every turn in his testimony in the due diligence hearing, Detective

---

[4] Respondent also cites *People v. Lepe* (1997) 57 Cal.App.4th 977, 986–987 [67 Cal.Rptr.2d 525], and footnote 1, disapproved on another ground by *Cromer, supra,* 24 Cal.4th at page 901, footnote 3, for the proposition that waiting until the first day of trial is reasonable. It is likewise distinguishable. In *Lepe*, the prosecution's efforts to serve a subpoena on a witness started two months before trial. (*Lepe*, at p. 986.)

Garcia emphasized he had not anticipated Gonzalez's moving from her apartment, making him confident he could locate her on the shortest possible notice. Respondent's brief echoes Detective Garcia's confidence, noting the People had no reason to believe Gonzalez would not appear for the retrial because she had voluntarily testified during the first trial despite Dario's hitting her. Yet despite Detective Garcia's (misplaced) confidence that Gonzalez was available on short notice, his excuse for waiting until the first day of trial to find her was his fear she would disappear if he gave her any advance warning. The inconsistency is fatal: If they feared she might be uncooperative and refuse to appear, then waiting until the morning the trial began arguably had merit. (*Diaz, supra*, 95 Cal.App.4th at p. 707.) But if the People had no reason to think she would try to avoid service, then waiting until the "11th hour" to contact her the morning trial started was not due diligence. (*Brown, supra*, 189 Cal.App.3d at p. 265; compare *People v. Cummings* (1993) 4 Cal.4th 1233, 1297 [18 Cal.Rptr.2d 796, 850 P.2d 1] [due diligence where police started searching for witness more than a year before testimony was needed and officer went to witness's house 10 times during trial trying to serve body attachment]; *People v. Linder* (1971) 5 Cal.3d 342, 346 [96 Cal.Rptr. 26, 486 P.2d 1226] [defendant's attempt to serve subpoena on missing ex-wife at last known address one day before trial constituted due diligence where defendant's attorney had previously contacted former wife's relatives and lawyer and hired detective trying to find her]; *People v. Saucedo* (1995) 33 Cal.App.4th 1230, 1236 [40 Cal.Rptr.2d 153], disapproved on another point by *Cromer, supra*, 24 Cal.4th 889, 901, fn. 3 [due diligence where police searched a full week for witness]; *People v. McElroy* (1989) 208 Cal.App.3d 1415, 1427 [256 Cal.Rptr. 853], disapproved on another point by *Cromer, supra*, at p. 901, fn. 3 [due diligence where subpoena issued more than three weeks before trial]; *People v. Smith* (1971) 22 Cal.App.3d 25, 31–32 [99 Cal.Rptr. 171] [due diligence where subpoena issued one week before trial and witness had assured police he would be available to testify]; *People v. Rodriguez* (1971) 18 Cal.App.3d 793, 796–797 [96 Cal.Rptr. 162] [due diligence where prosecution tried for six days before trial to serve subpoena on witness hiding to avoid service because he feared testifying].) The court thus erred in finding the People exercised due diligence in trying to secure Gonzalez's appearance and therefore erred by admitting her testimony from the first trial.

The error was not harmless. The People got a conviction only after a retrial. Plainly, the case had problems. The testimony of police witnesses was contradictory and conflicted in part with the testimony of independent

witnesses. Recounting his conversation with appellant as he lay on the freeway embankment, Officer Stevens testified that appellant, in a "regular speaking voice," refused to tell him where the gun was. Fellow officer Murphy and his partner, who arrived before Officer Stevens, did not, however, hear appellant say anything to Officer Stevens. And both Officer Murphy and the paramedic testified appellant was in great physical distress, with the paramedic testifying he heard appellant mumble only incomprehensible sounds until he reinflated his lung in the ambulance.

Furthermore, the evidence tying the gun to appellant was not airtight. Detective Joya found it about two hours after the shooting, lying in the middle of the intersection where appellant had been shot. It had fallen there unheard and unseen by Officers Perez and Clark where appellant presumably dropped it. K-9 officers who retraced appellant's path had overlooked it. The gun, which had no fingerprints, lay undiscovered for up to two hours near the command post and within 10 to 20 feet of an officer standing guard over bullet casings. Only when Detective Joya arrived was the gun discovered, but by then several hours had passed since the shooting.

Finally, it cannot go unnoticed that the testimony of Officers Perez and Clark changed in some respects. When Detective Joya interviewed each officer within hours of the shooting, neither could describe the gun beyond Officer Perez's recollection of a "palm-sized type of handgun." Neither could tell her its color or if it was a semiautomatic. In addition, both admitted during the first trial that they could not describe the gun. Yet, during the retrial both recalled the gun was a semiautomatic with a shiny barrel.

Given certain weaknesses in the case, Gonzalez was the most incriminating nonpolice witness against appellant. She testified he had been in her apartment seeking a gun. She also testified about his phone call from jail, during which they discussed the gun and whether she would support his plan to sue the police. Her testimony was important to both juries because both juries asked for a readback; but the first jury deadlocked and the second jury convicted—an important difference between the two trials being the first jury's opportunity, unlike the second panel, to judge Gonzalez's demeanor and credibility. We therefore cannot say that the different outcomes of the two trials did not turn on Gonzalez's not taking the stand during the second trial.

## DISPOSITION

The judgment is reversed and the matter is remanded for retrial.

Boland, J., and Flier, J., concurred.