Filed 12/30/13  P. v. Jordan CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B243324 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA 396905) |
| v. | |
| CHRISTINA ANN JORDAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Reversed.

Adrian K. Panton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

In this appeal, appellant Christina Ann Jordan demonstrates that her criminal conviction for assault with a deadly weapon must be reversed because the trial court prejudicially erred in admitting the victim's preliminary hearing testimony. The victim was not "unavailable" such that his preliminary hearing testimony would be admissible because the prosecution failed to exercise reasonable diligence to procure his attendance by the court's process. (Evid. Code, § 240, subd. (a)(5).)

## FACTS AND PROCEDURE

### 1. Incident

On March 28, 2012, Jerry Bridges had a puncture wound to his torso, which appeared to be a stab wound. He was hospitalized for his injuries the following day. Bridges told law enforcement his name was "James Stone," but he identified himself to hospital staff as Jerry Bridges. A police officer initially investigating the case discovered Bridges had an outstanding felony no-bail warrant. Police conducted interviews with other people, including Bridges's roommate, Ronnie Deloach, and a woman present at the time of the incident. However, police were unable to locate any other witnesses to the incident.

### 2. Information

In a one-count information, Jordan was charged with assault with a deadly weapon. It was alleged that Jordan personally inflicted great bodily injury under circumstances involving domestic violence and that she suffered numerous prior felony convictions.

### 3. Preliminary Hearing

Bridges's preliminary hearing testimony did not inculpate Jordan. To the contrary, Bridges testified at the preliminary hearing that he may have been cut by a mirror and that he consumed liquor, marijuana, and cocaine on the day of the incident. Bridges was in custody at the time of the preliminary hearing.

### 4. Trial

The prosecution was unable to locate Bridges before trial, and his preliminary hearing testimony was read to jurors. The parties stipulated that Bridges suffered seven

2

felony convictions between 1990 and 2007, and two misdemeanor convictions in 1989 and 1990. The felony convictions were for sale or transportation of a controlled substance, burglary, first and second degree robbery, grand theft, and possession or manufacture of combustible or explosive material (fire bomb). The misdemeanor convictions were for forgery and petty theft.

An officer and a detective were called to testify at trial concerning statements Bridges made prior to his preliminary hearing testimony. The prior statements were inconsistent with his preliminary hearing testimony. Officer Jay Balgemino testified that he spoke to Bridges the day after Bridges had been injured. Bridges said his ex-girlfriend Jordan stabbed him. Bridges told Balgemino he had been using a computer with another girlfriend when Jordan entered the apartment. Jordan started a verbal argument, which Bridges and Jordan continued outside. Bridges threatened to call the police if Jordan stayed. Jordan said, "Go ahead, mother fucker, call the police. I'll finish the mother fuckin' job right now." Bridges said he ran inside the apartment and Jordan ran to an unknown location.

Detective Rodrigo Rodriguez testified he spoke to Bridges at the hospital after Bridges had been treated. Bridges told Rodriguez that his ex-girlfriend Jordan "pulled a switchblade knife, said, I don't give a fuck. You think I'm playing. You think I'm a punk, advanced on him and stabbed him[.]" Bridges said that Jordan "need[ed] to go to jail for what she did."

A May 2012 phone call from Jordan to the apartment where the incident took place was played for the jury. "Ronnie" answered the phone. Jordan told Ronnie she had the police report. She read or paraphrased the contents of the report, including portions in which Bridges told police Jordan stabbed him. Jordan then summarized: "So, one, he-he gave a full fucking testimony. Two, he's on the run. Three, his injury wouldn't have been as serious if he would have went right then and there, do you understand?" Jordan said she was wondering if Bridges was "coming to court on me, or what?"

Ronnie suggested that Bridges was delirious when he spoke to police and could have accused anyone. Jordan responded: "But what I am saying is supposably [*sic*] there

3

was another girl involved. Why would you said I stabbed you why couldn't you say that my girlfriend got mad and stabbed me, you know what I'm saying? He needs to come to court and change his story. He needs to come to court and be like I don't see her or something because if they know I'm on the phone with you right now this is, this is a violation of, um, this court order. [¶] . . . [¶] . . . He needs to come Monday, something and be like I don't see her, you know? [¶] . . . [¶] . . . Or be like hey, who is that up there, that's not the person that stabbed me. Or something. He already gave them my name dude, that's the fucked up part about it, you know what I mean?"

During the call, Bridges entered the apartment. Jordan told Ronnie that Bridges was "going to have to clear his name somehow with me, do you understand what I am saying? Cause it is not like I just did that shit." After debating whether to speak with Bridges, Jordan asked Ronnie to put him on the phone. Ronnie asked Bridges if he was going to court to testify. Bridges said he was not pressing charges so he did not understand why he would have to go to court, and he would not go to court. Jordan told Bridges he had a felony no-bail warrant and the police would be looking for him. She continued: "Do you want to hear your statement? . . . I know it's you because of the shit that I said." Jordan told Bridges she had "been waiting for [him] to do right by [her]" since 2003. She said Bridges would have to go to court and the police were going to come and get him. Bridges claimed he did not give a statement to the police. Jordan asked: "So then why can't you come to court and say that?" Bridges responded: "Well, if that's what I gotta do, I will. They going to have to show me my . . . I ain't gave no fucking -- when they came to the hospital I told them that." Jordan told Bridges she was going to court on May 15. Bridges told Jordan not to worry. He again suggested he did not give a statement to police. He explained: "They came over here one day, man, about four of them, bamming on everybody's door, taking motherfucker's statements for a long time. So what the fuck, hell, everybody going to say the same god[am]n thing." Jordan reminded Bridges she was looking at the "paperwork" that identified Bridges as giving a statement. But Bridges continued: "Everybody -- when I went to the hospital, everybody

4

-- what happened to him?  Oh, his girlfriend stabbed him . . . that's the story that went around the whole fucking neighborhood.  So what the fuck you think they gonna say?"

Jordan asked:  "Then why couldn't it be the -- why couldn't it be the girlfriend you told to go in the room?  Why'd it have to be me?  [¶] . . . [¶] . . . Yeah, that's what you told them.  That me and my girlfriend were sitting at the computer when Jordan came by and she got mad because she saw me with another girl."  Bridges responded:  "Listen, you know, that only made crazy man sense."  He added:  "When I got stabbed everybody in this building know what the fuck happened.  Everybody told the detective the same motherfucking thing.  When they came to the hospital they said that.  We thought it was your girlfriend, why'd you give us, uh, a fake name.  They told me all that shit because I didn't even give them my fucking name when I went there."  Jordan answered:  "Well they got my name.  And my nickname.  Who knows my full name there?  Nobody but you."  She asked again if Bridges would come to court.  He insisted he would.

### 5.  *Judgment*

The jury found Jordan guilty of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).  The jury also found true the allegation that Jordan inflicted great bodily injury on Bridges under circumstances involving domestic violence (§ 12022.7, subd. (e)).  The trial court found three alleged prior convictions true.  The court sentenced Jordan to a total prison term of 12 years.

## DISCUSSION

The sole issue on appeal is whether the court erred in admitting Bridges's preliminary hearing testimony and thereby violated Jordan's confrontation rights.  Additional background is necessary to evaluate this contention.

### 1.  *Background*

On July 17, 2012, both sides announced ready for trial.  Trial was set for August 6.  On August 3, the People filed a motion to trail the jury trial because they were unable to reach or subpoena Bridges.  On August 7, the court held a hearing regarding the People's diligence in attempting to secure Bridges's attendance at trial.

5

Los Angeles County District Attorney's Office investigator Marlon Morgan testified as follows. Morgan received a subpoena for Bridges on July 23. That morning he began attempting to reach Bridges. Morgan checked Department of Motor Vehicle records and the Justice Data Interface Controller (JDIC) System, utility records, telephone records, and "deceased records." Morgan next went to the address for Bridges identified on the police report. Bridges was not there. He went to the apartment at 6:30 and 8:00 a.m. on July 23, and again on August 1 at 8:15 a.m. and 12:40 p.m. Morgan was unable to speak with anyone at the address about Bridges.

Morgan spoke with the on-site manager of the apartment complex. She did not know Jerry Bridges. Morgan did not have a photograph of Bridges. He provided only a general description of Bridges as a Black male, and provided Bridges's age. Morgan knocked on the doors of two or three neighbors, but did not speak to any of them. Morgan spoke to Delouch who had no contact information for Bridges. Morgan also spoke with the investigating officer on the case, who had no knowledge of Bridges's whereabouts. Morgan was not able to find any other location information for Bridges.

On cross-examination, Morgan indicated he was not aware that Bridges was on felony probation or that he had an upcoming court date on two "Proposition 36" cases. Morgan did not contact any Proposition 36 programs in Los Angeles County to determine if Bridges had checked in. Morgan said he was unaware that in dockets from Bridges's past criminal cases, his address was frequently listed as "transient." Morgan did not check any homeless shelters or the Department of Mental Health for information about Bridges. Morgan was also unaware that in a prior case, Bridges had provided an alias of Julio Demohammad Bridges. Morgan did not enter any of Bridges's aliases in the databases he searched for information, or otherwise use the "Julio Demohammad Bridges" alias to try to find him.

Jordan's counsel, however, had located two felony probation case numbers for Bridges in the trial court information system (TCIS). Morgan did not check the TCIS.

6

The court ruled that although it was a close case, it would find the People's efforts were reasonable. The People were allowed to read Bridges's preliminary hearing testimony to the jury.

*2. Analysis*

"The constitutional right implicated here is the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' [Citations.] This confrontation right seeks 'to ensure that the defendant is able to conduct a "personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."' [Citation.] To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling 'into question the ultimate "'integrity of the fact-finding process.'"' [Citation.]" (*People v. Cromer* (2001) 24 Cal.4th 889, 896-897 (*Cromer*).)

"Notwithstanding the importance of the confrontation right, it is not absolute. [Citation.] Traditionally, there has been 'an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . .' [Citation.] Before the prosecution can introduce testimony from a prior judicial proceeding, however, it 'must . . . demonstrate the unavailability of' the witness. [Citation.] Generally, a witness is not unavailable for purposes of the right of confrontation 'unless the prosecutorial authorities have made a *good-faith effort* to obtain [the witness's] presence at trial.' [Citations.]" (*Cromer, supra*, 24 Cal.4th at p. 897, italics added.) Under California law, a witness is unavailable if the witness is "[a]bsent from the hearing and the proponent of his or her statement *has exercised reasonable diligence* but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5), italics added.) In this context, reasonable diligence, also

7

referred to as due diligence, "'"'connotes persevering application, untiring efforts in good earnest efforts of a substantial character." [Citations.] Relevant considerations include "'whether the search was timely begun'" [citation], the importance of the witness's testimony [citation], and whether leads were completely explored [citation].'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 675 (*Fuiava*).)

### 3. The Trial Court Erred in Finding Bridges Unavailable and Admitting his Preliminary Hearing Testimony

"'When, as here, the facts are undisputed, a reviewing court decides the question of due diligence independently, not deferentially. [Citation.]' [Citation.]" (*Fuiava, supra*, 53 Cal.4th at p. 675.)

Here, each factor shows a lack of due diligence. First, the search for Bridges was not timely commenced. It cannot reasonably be disputed that Bridges was a reluctant witness. Even the prosecutor argued: "So Jerry didn't call the police, Jerry hid from the paramedics. Why would Jerry give them a fake name? Because Jerry's got warrants. Jerry doesn't like coming to court. Jerry doesn't want to be a snitch. Jerry exists outside the law . . . ." At the sentencing hearing, the prosecutor further argued: "And we know the reason he [Bridges] didn't go is that he had warrants and didn't want to be in the system, and Ms. Jordan chose her victim knowing full well his history and how he would react. She got the benefit of having someone who would be willing to avoid the court process or lie in court, but she also picked someone who wouldn't go to the hospital right away." After the incident Bridges told officers his name was James Stone. At the time Bridges was in the emergency room being treated for his injury, officers learned that he had an outstanding felony no-bail warrant. Although Bridges appeared at the preliminary hearing, he was in custody and recanted all of his prior statements. Under such circumstances, the prosecution should have begun searching for him more than two weeks before trial. (See *Cromer, supra*, 24 Cal.4th at p. 902 [finding absence of reasonable diligence when prosecution began searching about a month before trial for witness who had disappeared after the preliminary hearing].)

8

Second, Bridges was the victim and the *most* important witness. No eyewitness was found or testified. Bridges therefore was not only the victim but also the only percipient witness. Bridges's testimony was critical to evaluate his credibility, which was undermined not only by his inconsistent statements in this case but also by his long criminal history. Bridges had been convicted of sale or transportation of a controlled substance, multiple burglaries, first and second degree robbery, grand theft, possession or manufacture of combustible or explosive material, forgery, and petty theft. The cornerstone of Jordan's defense was that jurors should question Bridges's credibility, and Bridges's testimony was essential for jurors to evaluate his credibility.

Third, Morgan failed to discover and explore leads. The unexplored leads are numerous. Morgan did not know Bridges was on felony probation. Morgan did not know Bridges had court dates on two cases. Morgan did not check Proposition 36 referrals. When Morgan spoke to the apartment manager, he did not have a picture of Bridges and only described him as a Black male of a certain age. Morgan did not talk to anyone at Bridges's apartment complex. Morgan did not know Bridges was transient and did not check homeless shelters. Morgan did not know Bridges's alias and did not check his alias. Morgan did not contact persons in the immediate area or the person across the street who called 911. Morgan's efforts cannot be characterized as ""'"untiring,"'"" or of ""'"substantial character."'""[1] (*Fuiava, supra*, 53 Cal.4th at p. 675.)

"What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case." (*People v. Linder* (1971) 5 Cal.3d 342, 346.) Even if

[1]     The dissent faults this opinion for considering steps Morgan could have taken in evaluating the reasonableness of the prosecution's efforts to locate Bridges. (See dis. opn., *post*, at p. 1.) We are not unaware that our Supreme court has held that showing "'additional efforts might have been made or other lines of inquiry pursued does not'" show the prosecution failed to exercise reasonable diligence. (*Fuiava, supra*, 53 Cal.4th at p. 677; see *People . Cummings* (1993) 4 Cal.4th 1233, 1298.) This holding means that simply identifying additional steps that could have been undertaken is insufficient to demonstrate a lack of due diligence. However, our high court has not held that it is improper to *consider* other efforts that could have been undertaken when evaluating the reasonableness of a search.

the same efforts may be reasonable in other circumstances, here there was little connection between Morgan's efforts and his ability to actually locate Bridges. For example, checking phone records and utility records is of marginal benefit when the witness is transient. Although the police report revealed that Bridges used an alias, Morgan neither investigated nor checked Bridges's aliases. Nor did he check any Proposition 36 programs or learn about Bridges's felony probation or court hearings, which may have been good cause to continue the trial in this case to secure Bridges's presence. Thus, while Morgan's efforts may be sufficient in a hypothetical case, they were not reasonable in this particular case to secure the presence of Bridges, the victim and most important witness at trial.

### 4. The Error Was Not Harmless Beyond a Reasonable Doubt

The erroneous admission of Bridges's preliminary hearing transcript was not harmless beyond a reasonable doubt. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661 ["Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless."].) "'"An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless."'" (*People v. Louis* (1986) 42 Cal.3d 969, 993-994.)

The improperly admitted testimony prejudiced Jordan. Officer Balgemino and Detective Rodriguez testified as to Bridges's prior inconsistent statements. Their hearsay testimony was admissible only because the trial court admitted Bridges's preliminary hearing testimony. Balgemino and Rodriguez testified forcefully that Jordan stabbed Bridges and that she was willing to "finish" the "job." This testimony indicated that Jordan was an aggressor, pulling out a switchblade and advancing toward Bridges. It suggested that Bridges believed Jordan committed a crime and should be incarcerated. It gave meaning to Jordan's otherwise ambiguous jailhouse phone call. The admission of Bridges's prior inconsistent statements prejudiced Jordan because they were the strongest evidence of Jordan's guilt. A reasonable juror could rely on the strongest evidence to convict Jordan.

Even though Jordan's phone call was admissible regardless of Bridges's testimony, the officer's testimony and the detective's testimony gave context and coloring to Bridges's phone call. Without the inadmissible evidence, jurors may have interpreted Jordan's phone call to Bridges differently, especially given that Ronnie described Bridges as delirious and Jordan denied the accusations in the police report stating, "[c]ause it is not like I just did that shit." Because the inadmissible testimony essentially clarified and corroborated Jordan's phone call, admitting it prejudiced her.

The prosecutor used the improperly admitted testimony to great effect in his closing argument. The prosecutor argued that Bridges's statements described in the police report should be believed because he "told two separate officers the same story." Thus, the prosecutor was able to bolster Bridges's credibility -- the only disputed issue -- based solely on inadmissible testimony. Absent the prior inconsistent statements to two officers -- which were admissible only because Bridges's preliminary hearing testimony was admitted -- jurors may have reached a verdict more favorable to Jordan. The error in admitting Bridges's preliminary hearing testimony was not harmless beyond a reasonable doubt, and the judgment therefore must be reversed.

**DISPOSITION**

The judgment is reversed.


FLIER, J.

I CONCUR:


RUBIN, J.

11

**BIGELOW, P. J., Dissenting:**

I respectfully dissent.

The majority concludes the prosecution did not exercise reasonable diligence in attempting to locate Bridges, based on a failure to begin the search earlier, and the prosecution investigator's failure to discover and explore leads. However, the majority's analysis focuses only on what additional steps the prosecution *could have* taken. In my view, this is inconsistent with established principles regarding due diligence. I would find the People's actual efforts demonstrated reasonable diligence.

Our high court has repeatedly explained the due diligence standard is satisfied if the People used "reasonable efforts to locate the witness. "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.]" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 677; *People v. Valencia* (2008) 43 Cal.4th 268, 293.) " 'Where the record reveals . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually. . .with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations.] The law requires only reasonable efforts, not prescient perfection.' [Citation.]" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

Here, the prosecution investigator's process was reasonably thorough and demonstrated "substantial good faith efforts." He searched multiple databases using Bridges's name, and his date of birth. These databases *included* parole and probation records. The investigator searched DMV, utility, telephone, and death records. He went to the only address he could find for Bridges—where the incident took place—on two different dates, twice each day. He knocked on the doors of neighbors, but no one answered. Thus it is not simply that he "did not contact persons in the immediate area" of the incident, or "did not talk to anyone at Bridges's apartment complex." (Maj. Opn.

p. 9.)  Rather, he tried to talk to neighbors on both days he went to the scene.  There was no answer when he knocked on the neighbors' doors.  And the investigator did, in fact, speak with someone at the apartment complex: the apartment manager.  She simply had little useful information to share.  The investigator used what little information the apartment manager provided to track down Deloach.  Deloach said he had no knowledge of Bridges's whereabouts.

The prosecution's efforts in this case were not "perfunctory or obviously negligent."  (*People v. Bunyard* (2009) 45 Cal.4th 836, 855.)  The search did not begin belatedly or at the last minute.  (*People v. Sanders* (1995) 11 Cal.4th 475, 524-525 [defense did not exercise reasonable diligence where it waited until trial began to attempt to subpoena witness]; *People v. Avila* (2005) 131 Cal.App.4th 163, 169 [no reasonable diligence where search for witness began on first day of trial].)  The majority concludes beginning the search for Bridges two weeks before trial was unreasonably late because Bridges was a "reluctant" witness.  The record indicates Bridges recanted his statements to police during his preliminary hearing testimony.  He clearly did not want to incriminate Jordan.  But the record did not establish the prosecution should have known Bridges was likely to disappear before trial to avoid testifying.  As the prosecutor explained during the due diligence hearing, Bridges was in custody for reasons unrelated to the Jordan case when he testified at the preliminary hearing.  He gave two statements to police.  While he initially used an alias with police, he also had outstanding warrants at that time, which could have explained his attempt to hide his identity.  Those warrants were cleared at the time of the preliminary hearing.  And while Bridges changed his story at the preliminary hearing, there is no indication he avoided testifying.[1]

_____

[1]	In the recorded telephone conversation between Bridges and Jordan, Bridges was initially unwilling to testify, but, at Jordan's urging, he agreed he would go to court. Consistent with his assurances to Jordan, Bridges testified at the preliminary hearing, and provided exculpatory testimony.  In any event, the prosecution apparently did not receive Bridges's recorded telephone conversation with Jordan until shortly before the trial began, and after the People had begun looking for him.  Decisions about when to begin looking for Bridges could not have been informed by the content of the call.

2

There is no evidence in the record indicating the prosecution should have suspected Bridges was likely to be difficult to find, such that beginning the search two weeks in advance of trial was unreasonable. (*People v. Wilson* (2005) 36 Cal.4th 309, 342 (*Wilson*) [rejecting due diligence arguments where, except for describing witness as "unreliable and of suspect credibility," defense pointed to no evidence that the prosecution knew of a substantial risk the witness would disappear].) The prosecutor's statements in closing argument, or at the sentencing hearing, characterizing Bridges as a witness willing to avoid court process or one who "doesn't want to come to court," are not evidence of what the prosecution knew or should have known about Bridges *before* trial.

The majority also faults the prosecution for not discovering and exploring leads. Yet, as courts have recognized, hindsight usually offers the defense the ability to suggest additional steps the prosecution could have taken to locate a witness. That the prosecution could have done more, or could have pursued other sources of information, does not affect the conclusion that what *was* done was reasonably diligent. Bridges's felony probation did not surface during the prosecution investigator's search. But nothing in the record suggests the prosecution's failure to discover the information was due to a lack of diligence. The investigator searched a law enforcement database that included probation and parole records. The record does not shed any light on why the investigator's search of the Justice Data Interface Controller system did not return results for Bridges's probation. That Bridges had future court appearance dates is also of little import in this case. The majority does not explain how the mere fact that Bridges was scheduled to appear in court almost a month *after* Jordan's trial was set to begin could have assisted the prosecution in locating him in advance of the Jordan trial.

Moreover, while each case must be evaluated on its unique circumstances, relevant authorities on this issue support the conclusion that the prosecution's efforts in this case met the reasonable diligence standard. For example, in *Wilson,* an informant testified at a first trial of the defendant. The California Supreme Court set aside the judgment after finding the defendant's counsel was ineffective for failing to object to

3

inadmissible portions of the informant's testimony. At the penalty phase of the retrial, the prosecution represented the informant was unavailable and requested to read into the record portions of the testimony the Supreme Court concluded were admissible.

The first trial judgment was reversed in 1992; at that time the informant was still in prison or was recently released. The first witness in the new trial testified in late February 1994. The evidence adduced at a due diligence hearing established that in November 1993, a detective made efforts over two days to locate the informant. The detective visited the informant's last known address, attempted to locate his known associates, and checked police, county, and state records with 15 names the informant had used. His efforts were unsuccessful. (*Wilson, supra,* 36 Cal.4th at p. 341.) The trial court concluded the prosecution had established due diligence, and allowed the prosecution to read portions of the prior testimony to the jury, including statements that defendant told the informant he had hired a hit man to get rid of a particular witness. (*Id.* at pp. 339-340.)

On appeal, the defendant challenged the due diligence finding. He contended the prosecution should have contacted the informant soon after the first trial judgment was reversed. He also argued the detective should have "attempted to locate [the informant's] family, checked with the post office for [the informant's] forwarding address, followed up with his visitors in prison, and determined whether he was a party in any civil actions." (*Wilson, supra,* 36 Cal.4th at pp. 341-342.) Our high court rejected these arguments. It noted that the prosecution is not required to keep tabs on all material witnesses, and, absent knowledge that the witness is a flight risk, the prosecution is not required to take preventative measures to stop the witness from disappearing. The court noted: "Except for describing [the informant] as 'unreliable and of suspect credibility,' defendant does not point to any evidence that the prosecution knew of a substantial risk that [the informant] would disappear." (*Id.* at p. 342.) The court determined the detective's efforts established reasonable diligence, and rejected the claim that the efforts were not reasonable because other steps could have been taken. (*Ibid*; see also *Valencia, supra,* 43 Cal.4th at p. 292 [reasonable diligence where investigator searched for

4

telephone number; searched DMV records; went to witness's former addresses but witness no longer lived there; spoke with neighbors but received no leads; and found nothing searching a rap sheet, credit information, real estate holdings records, and court proceedings].) I see little difference in the quality and quantity of the prosecution's efforts in *Wilson,* and the prosecution's efforts in the case at bar.

In contrast, in *People v. Cromer* (2001) 24 Cal.4th 889 (*Cromer*), a case cited by the majority, the court found the prosecution did not exercise reasonable diligence. The witness testified at a preliminary hearing under subpoena, but two weeks later, law enforcement reported that she was no longer at the same address. Despite this information, the prosecution made no effort to serve subpoenas to secure the witness's attendance until six months later, only weeks before the trial was set to begin. Investigators went to the witness's house, but she was not there. Eventually, a man at the witness's former home told the investigators the witness was living with her mother in San Bernardino. Two days later they went to the mother's home, but were told the mother would return the following day. An investigator left a subpoena for the witness, but neither returned to speak to the witness's mother, nor attempted to find other ways to contact the mother.

Our high court concluded this was not reasonably diligent, explaining: "Although the prosecution lost contact with [the witness] after the preliminary hearing, and within two weeks had received a report of her disappearance, and although trial was originally scheduled for September 1997, the prosecution made no serious effort to locate her until December 1997. After the case was called for trial on January 20, 1998, the prosecution obtained promising information that [the witness] was living with her mother in San Bernardino, but prosecution investigators waited two days to check out this information. With jury selection under way, an investigator went to [the witness's] mother's residence, where he received information that the mother would return the next day, yet the investigator never bothered to return to speak to [the witness's] mother, the person most likely know where [the witness] then was. Thus, serious efforts to locate [the witness]

5

were unreasonably delayed, and investigation of promising information was unreasonably curtailed." (*Cromer, supra,* at p. 904.)

In this case, there is no evidence the prosecution knew or had reason to believe Bridges had disappeared, or would disappear, before trial. (See *People v. Martinez* (2007) 154 Cal.App.4th 314, 328 [distinguishing *Cromer* where there was no report shortly after preliminary hearing that witness had disappeared].) The prosecution investigator did not unreasonably delay in making serious efforts to find Bridges. There is no indication that starting the search earlier would have helped the prosecution find Bridges. (*People v. Herrera* (2010) 49 Cal.4th 613, 630 [rejecting Court of Appeal conclusion that prosecution was not diligent because it began search late; starting search earlier would not have made a difference in ability to procure witness's attendance at trial].) While the prosecution in *Cromer* had promising leads that it simply failed to pursue, here the investigator used several different, logical sources of information to try to locate Bridges. He located and spoke with Bridges's known associate, Deloach. The investigator never discovered any promising information, despite reasonable and competent efforts. The lack of prosecutorial diligence described in *Cromer* is not present here.

In my view, when the focus is on what the prosecution actually did, rather than on what it could have done, we should conclude the prosecution exercised reasonable diligence in attempting to locate Bridges. I would therefore affirm the judgment.


BIGELOW, P.J.

6