Filed 11/10/25  P. v. Danyeur CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBBIE DESMOND DANYEUR,<br><br>    Defendant and Appellant. | C098677<br><br>(Super. Ct. No. CRF220000304) |

Defendant Robbie Desmond Danyeur appeals from his conviction for corporal injury, among other crimes, most committed against victim Katie.  He raises two claims on appeal, both related to the trial court's determination that he forfeited his right to confront witnesses against him:  (1)  the prosecution failed to exercise due diligence in attempting to secure Katie's presence at trial; and (2)  the trial court erred when it found that defendant engaged in wrongdoing in dissuading Katie from testifying.  Finding no error, we affirm.

1

## FACTS AND PROCEEDINGS

*Katie's 911 Calls and the Trial Court's Forfeiture By Wrongdoing Finding*

On March 13, 2022, Katie called 911 three times: at 7:20 a.m., at 10:31 a.m., and at 11:22 a.m. The 911 calls were played for the jury. In the first call, Katie told the 911 operator that her boyfriend was assaulting her. Katie can be heard on the 911 call accusing defendant of punching her in the face and in the forehead. She appeared to further accuse defendant of jumping on her, grabbing her face, and covering her mouth when she tried to scream for help. Katie would not provide defendant's name to the 911 operator, stating her brother was in a motorcycle gang, and she could not "go telling people's names."

Deputy Irie McCleave responded to Katie's house at around 7:30 a.m. and interviewed her. Katie refused to provide the name of her assailant and would not allow McCleave to conduct a protective sweep of the house. McCleave did not notice any injuries on Katie's face, and did not see anything that made him want to search the house.

In the second 911 call, Katie said that defendant had returned to the house and was damaging it, and that she was scared. This time, Katie provided defendant's name and indicated that she had gone to a neighbor's house. In the third 911 call, placed before law enforcement responded to the second call, Katie said she was hiding in a bedroom closet, and defendant had threatened to pull a gun if law enforcement came to the house. She said that defendant had seen her at her neighbor's house and dragged her back to her house.

McCleave responded again to Katie's house at around 11:30 a.m. Katie appeared upset, frantic, agitated, and frustrated. McCleave recorded the interview with Katie, and a recording of the interview was played for the jury. Before playing the recording, the

2

trial court conducted an Evidence Code section 402 hearing outside the presence of the jury.[1]

At the conclusion of that hearing, the court found that defendant had forfeited his right to confront a witness against him (here, Katie) by engaging in wrongful conduct that was intended to and did procure her unavailability as a witness. The court then found Katie unavailable, and as a result permitted the jury to hear her previous statements about the crimes. In this appeal, defendant challenges the court's findings of unavailability and forfeiture by wrongdoing; we will set forth the procedural background of the court's findings in greater detail and address defendant's claims in the Discussion, *post*.

*Subsequent Evidence*

In her interview with Deputy McCleave, Katie explained that she had been dating defendant for approximately nine months, and that he did not live with her because her mother lived in the house, and he was not welcome there. Katie and defendant had been in an argument soon after awaking, defendant kicked her out of bed and then threw her back on the bed, got on top of her, screamed at her, covered her mouth when she tried to scream for help, and punched her in the head approximately 10 times. When defendant left the room, Katie called 911 the first time.

They went to the kitchen, where defendant continued to verbally assault Katie. Defendant then slammed a door hard enough for the window to break. They both left the house. Defendant called Katie and said he was sorry; she noted, "He always says that he's sorry."

Katie went to the neighbor's house to call 911. She called a friend, but defendant heard her and dragged her back into the house.

---

[1] Evidence Code section 402 provides the procedure for determining the existence or nonexistence of preliminary or foundational facts.

Further undesignated statutory references are to the Evidence Code.

3

Defendant and Katie had another argument, and then defendant got on top of her and strangled her for about 15 seconds. She had difficulty breathing, but did not lose consciousness. Defendant let her go, and she hid in her mother's bedroom closet.

Due to Katie's unavailability, her preliminary hearing testimony was read to the jury, in which she testified to a version of events similar to what she told McCleave.[2]

The prosecution also presented testimony of a qualified domestic violence expert, who testified about the cycle of violence in domestic violence relationships. As part of his testimony, the expert witness reviewed 1,153 text messages, 157 attempted video contacts, and three phone calls between defendant and Katie while defendant was in custody.[3] We will discuss the contents of these communications in greater detail in the context of the court's finding of forfeiture by wrongdoing in the Discussion, *post*.

*Procedural History*

A jury found defendant guilty of corporal injury to spouse, cohabitant, or child's parent (Pen. Code, § 273.5, subd. (a); count 1), criminal threats (*id.*, § 422; count 2), assault by means of force likely to produce great bodily injury (*id.*, § 245, subd. (a)(4); count 3), vandalism (*id.*, § 594, subd. (b)(2)(A); count 5), attempting to dissuade a witness (*id.*, § 136.1, subd. (a)(2); count 6), and contempt of court (*id.*, § 166, subd. (c)(1); count 7).[4] The trial court sentenced defendant to a determinate term of seven years in prison, and an indeterminate term of 50 years to life.

---

[2] To the extent there are differences in her versions of events, they are not material to the issues on appeal.

[3] The witness did not tabulate how many video contacts were completed, and he only tabulated how many phone calls were made between defendant and Katie as of March 2022, when he began his work on the case; trial took place in December.

[4] Count 4, charging possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)), was dismissed for insufficient evidence.

Defendant timely filed a notice of appeal.  The case was fully briefed in August 2025 and assigned to this panel the following month.

## DISCUSSION

Katie testified at the preliminary hearing in July 2022, but failed to appear at trial in December.  The prosecution asked the trial court to admit Katie's prior out-of-court statements under the forfeiture by wrongdoing exception, which provides that a prior testimonial statement is not made inadmissible by the confrontation clause if the defendant induced a witness's unavailability by wrongful conduct intended to procure the witness's unavailability.  The trial court found that Katie was an unavailable witness, which required a determination that the prosecution had exercised due diligence to obtain Katie's presence at trial, and that defendant had forfeited his right to confront Katie because he induced her unavailability by wrongful conduct intended to procure her unavailability.  Accordingly, the court admitted Katie's out-of-court statements, including her preliminary hearing testimony, her interview with McCleave, and her jail communications with defendant.  On appeal, defendant challenges the trial court's determination that the prosecution exercised due diligence, and its determination of forfeiture by wrongdoing.

I

*Confrontation Clause and the Forfeiture By Wrongdoing Exception*

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses.  (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15.)  The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is

5

worthy of belief.' " [Citation.] To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate ' "integrity of the fact-finding process." ' " ' " (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*).)

In *Crawford v. Washington* (2004) 541 U.S. 36, at pages 61 through 68, the United States Supreme Court held that the Sixth Amendment confrontation clause bars the admission of testimonial statements by a non-testifying witness unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. In *Crawford*, the court did not fully define "testimonial" statements, but noted they include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogation." (*Id.* at p. 68.) The California Supreme Court has distilled the following principles from *Crawford* and subsequent cases defining "testimonial": "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to

produce evidence about past events for possible use at a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

As relevant here, testimonial statements that have not been subject to cross-examination can be admitted into evidence without offending the confrontation clause if a defendant causes a witness to be unavailable by wrongful conduct intended to cause the witness to be unavailable. (*Giles v. California* (2008) 554 U.S. 353, 367; *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1185.) Commonly known as "forfeiture by wrongdoing," the exception seeks to prevent defendants from undermining the judicial process by procuring or coercing silence from witnesses and victims (*Davis v. Washington* (2006) 547 U.S. 813, 833), and it applies if "at least one" of the defendant's reasons for committing the wrongdoing was to make the declarant unavailable as a witness (*People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1049).

Forfeiture by wrongdoing is codified in section 1390, subdivision (a), which provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." The party seeking to introduce evidence under the exception must establish admissibility by a preponderance of the evidence in a foundational section 402 hearing. (§ 1390, subd. (b)(1), (2).) The hearsay evidence that is the subject of the hearing may be used in the foundational hearing, but independent corroborative evidence must support admission of the hearsay evidence. (*Id.*, subd. (b)(2).) In making its determination, the court may consider evidence presented at the hearing or, if the hearing is conducted after trial has begun, evidence already presented to the jury. (*Id.*, subd. (b)(3).) The court may consider whether the hearsay evidence is trustworthy and reliable. (*Id.*, subd. (b)(4).)

Section 240, subdivision (a)(5) defines "unavailable" in this context: " '[U]navailable as a witness' means that the declarant is . . . [¶] . . . [¶] [a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence

7

but has been unable to procure his or her attendance by the court's process."
"Reasonable diligence, often called 'due diligence' in case law, ' "connotes persevering
application, untiring efforts in good earnest, efforts of a substantial character." ' "
(*People v. Cogswell* (2010) 48 Cal.4th 467, 477.)

In determining whether the People exercised reasonable diligence in procuring a
witness's presence at trial, the factors we consider include " 'the timeliness of the search,
the importance of the proffered testimony, and whether leads of the witness's possible
location were competently explored.' " (*Herrera*, *supra*, 49 Cal.4th at p. 622.) Courts
have found reasonable diligence "when the prosecution's efforts are timely, reasonably
extensive and carried out over a reasonable period," but not where "the efforts of the
prosecutor or defense counsel have been perfunctory or obviously negligent." (*People v.
Bunyard* (2009) 45 Cal.4th 836, 856, 855.) Reasonable diligence does not require
exhaustion of every possible means of investigation, only "reasonable efforts to locate the
witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.) "That additional efforts
might have been made or other lines of inquiry pursued does not affect" the finding of
reasonable diligence. (*Ibid*.)

II

*Unavailable Witness Determination*

We turn first to defendant's challenge to the trial court's due diligence
determination. "We review the trial court's resolution of disputed factual issues under
the deferential substantial evidence standard [citation], and independently review whether
the facts demonstrate prosecutorial good faith and due diligence." (*Herrera*, *supra*, 49
Cal.4th at p. 623.) As we next explain, the facts here demonstrate prosecutorial good
faith and due diligence.

A. *Additional Background*

On July 12, 2022, Katie testified at the preliminary hearing. On Wednesday,
December 7--the sixth day of trial--Katie appeared in court while the parties continued

8

jury selection. The purpose of Katie's appearance was to schedule her testimony on a date she was available. The prosecutor indicated he was prepared to call her the following day, but Katie informed the court she was unavailable. The prosecutor responded that he would be able to call her the following Tuesday, December 13; Katie agreed to appear that morning, and the court ordered her to do so.

On December 13, Katie did not appear. The prosecutor informed the trial court that Katie had confirmed to him after the hearing on December 7 that she intended to return to court to testify. The court speculated that Katie may have failed to appear because she did not want to provide testimony that would harm defendant; it noted that Katie had previously indicated that she was not going to testify or did not want to testify, and recalled hearing Katie tell defendant that she loved him. The court added that although Katie had previously expressed reluctance to testify, she modified her response after the court "was a little bit stern with her," and she had appeared on December 7. Katie's appointed counsel expressed his understanding that Katie was refusing to testify and would not be present.

The trial court observed that it could admit the former testimony of a witness who was physically available but who refused to testify if it found the witness to be unavailable, but only after taking reasonable steps to induce the witness to testify, provided such steps would not be obviously unavailing. The court noted that it had spoken with Katie several times, had made it clear that she was required to appear and testify and there would be consequences if she refused, and indicated its intent to issue a warrant for her. The prosecutor added that he had texted Katie and called her cellphone and home phone that morning, but no one answered. He also called Katie's mother, with whom Katie lived, and he suggested that "the only other choice we would have would be to go and have someone pick her up, and that whole process I think could be damaging -- more damaging to her and to her mental health."

9

Defense counsel argued that the parties did not know why Katie had not appeared, noting that she had previously appeared each time she was required to do so, and requested that the court issue a body attachment on the subpoena previously served on her before deeming her unavailable. The prosecutor noted that Katie's mother was scheduled to testify that afternoon, and she could potentially explain Katie's failure to appear. The court issued the body attachment for her to be brought to court that afternoon.

During the lunch recess, the prosecutor told Katie via text message that she was to appear at 1:30 p.m. Katie's appointed counsel and the victim advocate also attempted to contact Katie but were unsuccessful. The court subsequently declined to issue a body attachment, reasoning that it wanted to avoid traumatizing her "yet again by this whole series of events." The prosecutor indicated that Katie's mother had informed him that Katie was "very stressed out about this upcoming trial, that she has been spending most of her time in bed, and is traumatized about coming to court. And that she doesn't know . . . what her daughter is going to do. She plans on attending. To try to keep the peace in the house, she tries not to bring it up too much with her daughter."

When the parties reconvened at 1:30 p.m., the prosecutor indicated that he called Katie again, but she did not answer, and he had sent an investigator to Katie's house, but "nobody was home." The victim advocate called two phone numbers associated with Katie; the call did not go through on one number, and the advocate left a voicemail on the other. The prosecutor noted that Katie's mother was in the hallway outside the courtroom in advance of her testimony. The prosecutor reported that Katie's mother was not surprised that Katie had not appeared because she was "stressed" about the trial and had been spending a lot of time in bed.

Defense counsel argued that Katie had failed to appear due to health or mental health issues, and not a desire to avoid harming defendant with her testimony. He requested a body attachment be issued and to give the parties another day to locate Katie.

10

The trial court declined counsel's request, reasoning that doing so would further traumatize Katie. The court then concluded it did not need to hold Katie in contempt before deeming her an unavailable witness, and made the following findings: "In this case, I have -- just to itemize what I have done here: I have delayed the hearing. I have met with the witness, and ordered her back to [*sic*] a convenient time consistent with her schedule; I've gotten her input on that. I have had the [district attorney's] office contact her. I've appointed counsel for her. I've had her own attorneys contact her. She's told me before that she doesn't intend to testify. The only thing I haven't really done is taken her into custody, which is discouraged, to say the least, by [California Code of Civil Procedure section] 1219.[5] [¶] This case has been substantially delayed for all sorts of reasons, including accommodating this witness, and I'm determined to conduct the case timely, respect the defendant's speedy trial rights and the schedule that both of the attorneys have set for their witnesses. [¶] So having made all of those determinations, I hereby find her unavailable, and I don't intend to take any further efforts to procure her. [¶] So that's the Court's finding, and we'll proceed without her. And I've already made a finding of forfeiture by wrongdoing, so the statements that were previously identified on the record can come in."

B. *Analysis*

Defendant contends the prosecution failed to exercise due diligence in procuring Katie's presence at trial. He argues the trial court and the parties were aware that Katie had reservations about appearing at trial, neither the court nor the prosecutor made any

---

**5** Code of Civil Procedure section 1219, subdivision (b) provides in relevant part: "Notwithstanding any other law, a court shall not imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime."

11

effort prior to the day set for her testimony to locate her, and the efforts on the date scheduled for her testimony were de minimis.

We agree with the trial court's finding of due diligence. The prosecution served Katie with a subpoena in March, and Katie testified at the preliminary hearing. Katie then appeared in court during trial for the express purpose of scheduling her testimony and ordering her to appear. During that hearing, the prosecutor sought to have her testify the following day, but Katie responded that that day did not work for her schedule. Instead, the court ordered Katie to appear for her testimony the following week, and she expressly agreed to appear. Following that hearing, the prosecutor spoke with Katie, and she again agreed to appear as scheduled. Additionally, while the court recognized that Katie had previously indicated she did not intend to testify, it observed that Katie had modified her response after the court "was a little bit stern with her." Accordingly, this is not a case in which the prosecution's efforts to begin searching for Katie were untimely. Rather, the prosecutor diligently secured Katie's presence in court during trial to schedule her testimony on a date convenient for her, and even took the additional step of meeting with her following the hearing to seek further assurances that she would appear as ordered.

On the day she was scheduled to testify, the prosecutor, victim advocate, and Katie's appointed counsel all attempted to contact her via phone and text. An investigator went to her known address, but found "nobody." Katie's appointed counsel informed the court that he believed Katie was refusing to testify and would not be present. While defendant argues there was no attempt to interview Katie's mother while she was at the courthouse, the prosecutor expressly stated that he spoke with Katie's mother, who expressed that Katie had been "stressed" about the trial and had been spending a lot of time in bed. The prosecutor had also called Katie's mother in the morning when Katie had first failed to appear.

12

Defendant argues there was no attempt to contact Katie's friends, or to search public records for arrests, hospitalizations, or a change of address. Although this is true, Katie's mother (and housemate) reported nothing to suggest that Katie had been arrested or hospitalized, or was living elsewhere. Indeed, she reported that Katie had been home in bed. The evidence gleaned from the prosecutor's discussion with the mother and comments by Katie's attorney pointed to the likelihood that Katie was simply unwilling to testify at trial. The standard for due diligence is reasonableness, not perfection. (*People v. Cummings*, *supra*, 4 Cal.4th at p. 1298; *People v. Diaz* (2002) 95 Cal.App.4th 695, 706; *People v. Wise* (1994) 25 Cal.App.4th 339, 344.) "That additional efforts might have been made or other lines of inquiry pursued does not affect" the finding of reasonable diligence. (*Cummings*, at p. 1298.) There is nothing here to indicate that the prosecution's efforts to secure Katie's presence were not reasonable.

Defendant seeks to analogize the facts here to those in *People v. Ayala* (2024) 101 Cal.App.5th 62, and *People v. Avila* (2005) 131 Cal.App.4th 163, but those cases are readily distinguishable.

In *Ayala*, the witness was present at the time the crime occurred and testified at the preliminary hearing before disappearing. (*People v. Ayala*, *supra*, 101 Cal.App.5th at pp. 66-67.) Two weeks before trial, an investigator went to her known addresses, learned that the witness was transient, and left a message on one of three phone numbers provided by a relative. The investigator ran the witness's name through a database and distributed a flyer with the witness's information to law enforcement. The investigator then returned to two addresses he had originally located, called one of the phone numbers, and visited two markets where the witness was known to have gone. (*Id.* at pp. 68-69.) The appellate court found that the prosecution's efforts were insufficient to establish unavailability, highlighting the witness's importance to the prosecution and the untimeliness with which the search for the witness had begun. (*Id.* at pp. 69-71.)

13

In *Avila*, a witness testified in the defendant's first trial, which resulted in a mistrial. (*People v. Avila, supra*, 131 Cal.App.4th at pp. 164, 167.) The prosecution was unable to locate the witness for the second trial. At a due diligence hearing, a neighbor of the witness testified that the witness had moved since the first trial. On the day trial was set to begin, a detective went to the witness's residence and left his card, and he left two voice messages with the witness. The detective checked electronic databases and was told by a deputy sheriff that the witness still lived in her apartment. (*Id.* at pp. 167-168.) The appellate court determined that it was not generally reasonable to attempt to locate a witness only a day or two before the witness was scheduled to testify after being out of touch for several months. (*Id.* at p. 169.)

Here, unlike *Ayala* and *Avila*, there is nothing to suggest that the prosecutor's efforts to locate Katie were untimely. As we have outlined in detail *ante*, Katie was timely ordered to appear on the date she preferred, and she verbally agreed more than once to be there. Less than a week had passed before she failed to appear and ceased all communication, although it was clear she was aware of her obligation. These facts demonstrate prosecutorial good faith and due diligence to secure her appearance. (*Herrera, supra*, 49 Cal.4th at p. 623.)

### III

### *Forfeiture by Wrongdoing*

We now turn to defendant's contention that the trial court violated his Sixth Amendment right to confront the witnesses against him by finding that he engaged in wrongdoing intended to procure Katie's unavailability at trial. As we will explain, substantial evidence supports the court's forfeiture finding.

A. *Additional Background*

The prosecution filed a motion in limine arguing that defendant forfeited his right to confrontation by exerting control over Katie in an effort to dissuade her from testifying against him. The motion asserted that defendant repeatedly ignored a no-contact order

14

that had been in place since his arraignment in March 2022, even after he was charged with violating the order and dissuading a witness. It argued that defendant exhibited a persistent pattern of exerting control over Katie by showering her with love and affection, by discussing his case, his possible exposure, and his desire that Katie not testify, by imploring Katie to help him get out of custody so they could resume their relationship, by inveighing against the conditions in jail to elicit Katie's sympathy, by indicating that his father would pay Katie to cooperate, by attempting to pit Katie against the district attorney's office, and by attempting to isolate Katie. In support of the motion, the prosecutor attached an exhibit containing numerous text messages between defendant and Katie.

At a hearing on the parties' motions in limine, the prosecutor argued that evidence of the jail communications, Katie's preliminary hearing testimony, her 911 calls, and her law enforcement interview should all be made admissible due to defendant's efforts to control Katie and dissuade her from testifying, which was evidenced by the jail communications between defendant and Katie.

On December 13, after Katie had failed to appear on the morning scheduled for her testimony, the trial court conducted a section 402 hearing on forfeiture by wrongdoing. The following evidence was adduced at the hearing.

On March 13, Katie called 911 to report defendant's conduct; the call was admitted into evidence. In the background, defendant could be heard "begging [her] not to make [a] report, not to say anything." Katie said she already had, and she told him that if he left the house, she would not tell the police his name. Defendant was arrested two days later.

On March 18, defendant was arraigned, and the court issued a no-contact and a criminal protective order prohibiting him from contacting Katie. On March 20, defendant called Katie twice from jail. Defendant was crying, and he told Katie he loved her and asked her to get him out of jail. Katie said she could not get him out of jail; he responded

15

that he was sorry, he was sober, and he had been on suicide watch. He then asked her if she would be "here for [him]." They also talked about the preliminary hearing; defendant told Katie she did not have to appear at the hearing, and he suggested that she write a letter to either the prosecutor or the judge explaining that they were just arguing. When she told him that he had "fucked up" her face and suggested that law enforcement had taken photographs, he apologized and changed the subject. When at one point the call was cut off, defendant called Katie again. Following the preliminary hearing on July 12, and based on these two jail calls, defendant was held to answer on charges of dissuading a witness.

Following the preliminary hearing, defendant and Katie continued to exchange messages in violation of the no-contact order. There were more than 1,000 text messages in total--the prosecutor cited defense counsel's assertion that defendant sent 700, and Katie 400. The prosecutor characterized the text messages as including "a lot of buttering her up and sweetness."

The prosecutor also pointed to a significant amount of video communication between defendant and Katie that took place up until the trial readiness conference. In those communications, defendant encouraged Katie to not testify at trial, asked her if she is going to be "on his team" or "on his side," and sought reassurance that she was "with him." He also discussed his potential sentence.

The prosecutor argued that the evidence showed defendant "overtly encouraging [Katie] not to testify, telling her what to do, to write letters to try to get him off the hook. His plan is that he thinks that if she doesn't testify, then he walks out free. And he even says, like, [']You're on my team. I'll be['] -- on the Friday before trial readiness, [']I'll be seeing you soon.['] So just the sheer quantity." The prosecutor added that there was jail communication between defendant and his father in which defendant told his father that Katie had blocked his number and asked his father to get Katie to unblock him. Defendant's father responded that Katie was not going to testify. Additionally, at the

16

preliminary hearing, Katie was scared by the presence of defendant's father at the hearing, but by the time of the trial readiness conference she was asking defendant if she could get money from defendant's father, and defendant responded that his father would give them both money.

Defense counsel argued that the evidence did not show intent to dissuade Katie from testifying. Instead, defendant's statement about being on suicide watch was just stating a fact (rather than a threat of self-harm), nothing in the evidence showed that defendant did not talk to Katie as affectionately at other times in their relationship as he did in their jail communications, there was evidence that Katie did not appear in court due to her brother's gang affiliation, defendant's request that Katie get him out of jail could have been a request that she bail him out, there was no evidence that defendant's father paid Katie to not testify or threatened her, and there was no evidence that defendant told Katie not to appear after she had already testified at the preliminary hearing.

The trial court found forfeiture by wrongdoing, reasoning as follows: "The no-contact and the criminal protective order were violated over and over and over again through extensive contacts with the victim that talk about not only affection for the victim, but also makes [*sic*] specific reference to the court proceedings and how important it is that she testify in a certain manner or that she not testify at all. [¶] The Court also notes that the trustworthiness of the hearsay sought to be admitted into this case is high as is it's [*sic*] reliability because it's recorded both in the form of the jailhouse communications and in the form of the Officer McCleave recorded interview. [¶] There is, as is required, independent corroboration separate and apart from the hearsay statements that support the Court's decision, and I've identified those. But I would add to the courthouse communications and the evidence of those and the recording, the officer's testimony, and observations of the victim. [¶] So the Court finds

17

that doctrine definitely applies here, and in the event the victim fails to show up, all that evidence would come in under the forfeiture by wrongdoing exception."

B. *Analysis*

We set forth the law regarding forfeiture by wrongdoing, *ante*. A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. (*People v. Quintanilla*, *supra*, 45 Cal.App.5th at pp. 1049-1050.) But where the issue is "whether the trial court erred in finding that a defendant engaged in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness, we apply a substantial evidence standard in reviewing the trial court's finding regarding the defendant's intent." (*Id.* at p. 1050.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) In applying this standard, we view the record in the light most favorable to the trial court's determination and give due deference to how the court may have resolved conflicts in the evidence or drawn reasonable inferences from the evidence. (*Conservatorship of O.B.* (2009) 9 Cal.5th 989, 996.)

Defendant raises three arguments. First, he argues the trial court improperly found without substantial evidence that he made "specific reference to . . . how important it is that she testify in a certain manner or that she not testify at all." We disagree.

Two days after the trial court imposed a no-contact order prohibiting defendant from contacting Katie, he called her from jail and they discussed the upcoming preliminary hearing. Defendant asked Katie to get him out of custody (noting that he had been on suicide watch), told her that she did not have to testify at the hearing, and asked her to write a letter to the judge that minimized his crimes. Following those communications, defendant sent Katie approximately 700 mostly manipulative text messages and engaged in video communications wherein he encouraged her to not testify at trial, asked her if she was "on his team" or was "on his side," and sought reassurance that she was "with him." This is substantial evidence of "specific reference to . . . how

18

important it is that [Katie] testify in a certain manner or that she not testify at all," and thus supports the trial court's finding.

Second, defendant argues the trial court improperly found Katie's recorded law enforcement interview trustworthy because no evidence of the interview was introduced at the section 402 hearing or at trial before the hearing. (See § 1390, subd. (b)(4) ["In deciding whether or not to admit the statement, the judge may take into account whether it is trustworthy and reliable"].) Defendant argues the interview was not in the record, and therefore the court could not determine that it was trustworthy. But the court clearly was aware that there had been a recorded law enforcement interview and knew the surrounding circumstances. Indeed, McCleave testified about the recording in front of the jury moments before the court conducted the section 402 hearing regarding the forfeiture by wrongdoing exception. McCleave testified that he responded to Katie's house on the date of her 911 call and recorded an interview with her because she said she wanted to report the assault. He further testified that the recording device he used was reliable and was used in the ordinary course of business, and that he listened to a portion of the recording and had identified Katie's voice on the recording. This is substantial evidence supporting the finding that the recorded interview was trustworthy.

Third, defendant argues that no independent evidence corroborated the court's finding of forfeiture by wrongdoing. (See § 1390, subd. (b)(2) ["The hearsay evidence that is the subject of the foundational hearing is admissible at the foundational hearing. However, a finding that the elements of subdivision (a) have been met shall not be based solely on the unconfronted hearsay statement of the unavailable declarant, and shall be supported by independent corroborative evidence"].) In support of its finding that independent corroboration supported its decision of forfeiture, the trial court pointed to defendant's numerous violations of the no-contact order and McCleave's testimony about the recorded interview and his observations of Katie (as upset, frantic, agitated, and frustrated).

19

Defendant argues the statements in the jail communications cannot corroborate themselves, and defendant's numerous violations of the no-contact order only demonstrate that both he and Katie were willing to ignore the order. But subdivision (b)(2) of section 1390 requires only that the finding of wrongdoing shall not be based solely on the unconfronted hearsay statement of the unavailable declarant, and must be supported by independent corroborative evidence. Evidence that defendant violated the no-contact order an estimated 700 times to contact Katie--the victim witness in a trial charging him with domestic violence--supports the finding that defendant was engaged in conduct intended to dissuade Katie from testifying against him.

Defendant further argues that the trial court could not rely on McCleave's testimony because he had not offered any substantive testimony at trial before the section 402 hearing. But as we have discussed, McCleave testified at trial before the section 402 hearing about Katie's 911 calls, the recordings of which were played for the jury during his testimony,[6] that he had recorded his interaction with Katie when he responded to her house the second time, and his observations about Katie's demeanor during his interaction with her. Katie's 911 calls were independent corroborative evidence supporting the forfeiture finding. As the high court has recognized, acts of domestic violence are often intended to dissuade a victim from resorting to outside help, and evidence that a defendant had previously committed acts of domestic violence intended to dissuade a victim from resorting to outside help is highly relevant to the inquiry of whether a defendant's conduct was intended to prevent the victim from cooperating with a criminal prosecution. (*Giles v. California*, *supra*, 554 U.S. at p. 377; see also *id.* at p. 380 (conc. opn. of Souter, J.) [stating the required intent "would normally be satisfied by the intent inferred on the part of the domestic abuser in [a] classic abusive relationship"];

---

[6] The 911 calls were admitted as spontaneous declarations pursuant to section 1240.

20

*Davis v. Washington*, *supra*, 547 U.S. at pp. 832-833 [domestic violence offenses are notoriously susceptible to intimidation or coercion of the victim].) Here, Katie stated when on the phone with the 911 dispatcher, "Like I'm - I'm really scared. He told me if I called the cops on him he was gonna kill me." Evidence of the 911 call in which Katie expressly recounted defendant's threat to kill her if she reported his abusive conduct supported the court's finding that defendant's subsequent conduct was also intended to dissuade her from testifying in the trial against him. Further supporting the credibility of Katie's recollection of defendant's threat was McCleave's testimony about Katie's demeanor mere minutes after she relayed defendant's threat to the 911 operator.

Substantial evidence supports the trial court's ruling that the forfeiture by wrongdoing exception applied.

## DISPOSITION

The judgment is affirmed.

/s/
Duarte, Acting P. J.

We concur:


/s/
Boulware Eurie, J.


/s/
Feinberg, J.